THOMAS G. CARRUTHERS
FLORENCE M. BEAUBOEUF
O'MELVENY & MYERS LLP
7 Times Square
New York, New York  10036
Telephone:     (212) 326-2000
Facsimile:     (212) 326-2061

JON M. SANDS, Federal Public Defender
DALE A. BAICH (Ohio Bar # 0025070)
MEGAN MORIARTY (Missouri Bar # 53226)
OFFICE OF THE FEDERAL PUBLIC
DEFENDER FOR THE DISTRICT OF
ARIZONA
850 West Adams Street
Phoenix, Arizona  85007
Telephone:     (602) 382-2700
Facsimile:     (602) 382-2801

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GREGORY DICKENS, DONALD EDWARD BEATY, CHARLES M. HEDLUND, MICHAEL EMERSON CORRELL, ROBERT WAYNE MURRAY, THEODORE WASHINGTON, and TODD SMITH, <br><br> Plaintiffs, <br><br> v. <br><br> JANET NAPOLITANO, Governor of the State of Arizona, DORA B. SCHRIRO, Director of the Arizona Department of Corrections, ROBERT STEWART, Warden, Arizona State Prison Complex-Eyman, CARSON McWILLIAMS, Warden, Arizona State Prison Complex-Florence, and DOES 1–50, UNKNOWN EXECUTIONERS, in their official capacities as Employees, Contractors and/or Agents of the Arizona Department of Corrections. <br><br> Defendants. | Case No. 07-cv-01770 (NVW) <br><br> **FIRST AMENDED COMPLAINT FOR EQUITABLE AND INJUNCTIVE RELIEF [42 U.S.C. § 1983]** |

1 **NATURE OF THE ACTION**

2     1.    This action is brought under 42 U.S.C. § 1983 for violations and threatened

3 violations of Plaintiffs' rights to be free from cruel and unusual punishment under the Eighth

4 and Fourteenth Amendments to the United States Constitution, and for violations and threatened

5 violations of Plaintiffs' rights to be free from arbitrary and capricious Arizona Department of

6 Corrections ("ADC") protocols and procedures under the Fifth and Fourteenth Amendments to

7 the United States Constitution.

8     2.    This Complaint does not challenge Plaintiffs' underlying capital convictions or

9 sentences of death, nor does it allege that lethal injection as a form of execution is *per se*

10 unconstitutional.  Methods of lethal injection that would comply with the United States

11 Constitution exist and are available for Defendants' use.  Rather, Plaintiffs challenge only the

12 manner and means by which the ADC intends to execute condemned inmates by lethal injection

13 under its protocol dated November 30, 2007 ("November 30 Protocol"), attached hereto as

14 Exhibit A, or any future version of the ADC's lethal injection protocol.[1]

15     3.    Plaintiffs contend that lethal injection, as that method of execution is currently

16 administered in Arizona, unnecessarily risks the infliction of torturous pain and suffering upon

17 condemned inmates.  Plaintiffs further contend that the nature of the chemicals used by

18 Defendants to effectuate execution by lethal injection, coupled with Defendants' failure to

19 implement sound procedures and to guarantee the use of properly-trained and qualified

20 personnel, unnecessarily risks and creates a highly foreseeable probability that Plaintiffs will

21 experience excruciating pain and suffering during execution.

22     4.    Plaintiffs seek equitable and injunctive relief to prevent Defendants from carrying

23 out their executions by means of lethal injection, as that method of execution is currently

24 performed in the State of Arizona under the November 30 Protocol, or any similar protocol.

25

26 [1] It is unclear whether the November 30 Protocol has been officially promulgated.  The ADC's prior execution
protocol was published in an execution manual promulgated as ADC Department Order 710.  There is no indication

27 within the November 30 Protocol, however, whether that protocol is attached to a Department Order or whether it is
published as part of a broader execution manual.  Nor is there any indication whether it supersedes ADC Department

28 Order 710.  Rather, the November 30 Protocol is entitled "Preparation and Administration of Chemicals" and begins
its section headings as if it were a stand-alone document.

Plaintiffs ask that the ADC be restrained from carrying out their executions until such time as it has eliminated the risk of unnecessary pain and suffering in violation of the United States Constitution.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights violations), § 2201 (declaratory relief), and § 2202 (further relief).  This action arises under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983.

6.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because all Plaintiffs are currently incarcerated in Arizona State Prison Complex–Eyman, located within this District.  All executions performed by Defendants are carried out in Central Unit at Arizona State Prison Complex–Florence, also located within this District.  The events giving rise to this Complaint have occurred and/or will occur in this District.

## PARTIES

### *Plaintiffs*

7.     Plaintiff Gregory Dickens is a United States citizen and a resident of the State of Arizona.  He is currently a death row inmate under the supervision of the ADC (Inmate No. 102305).  He is held at the Arizona State Prison Complex–Eyman, 4374 East Butte Avenue, Florence, Arizona, 85232.  Mr. Dickens was sentenced to death for a crime committed before November 23, 1992, and therefore may choose under Ariz. Rev. Stat. § 13-704(b) whether to be executed by lethal injection or lethal gas.  He has not yet chosen his method of execution.

8.     Plaintiff Donald Edward Beaty is a United States citizen and a resident of the State of Arizona.  He is currently a death row inmate under the supervision of the ADC (Inmate No. 054558).  He is held at the Arizona State Prison Complex–Eyman, 4374 East Butte Avenue, Florence, Arizona, 85232.  Mr. Beaty was sentenced to death for a crime committed before November 23, 1992, and therefore may choose under Ariz. Rev. Stat. § 13-704(b) whether to be executed by lethal injection or lethal gas.  He has not yet chosen his method of execution.

2

1      9.    Plaintiff Charles Michael Hedlund is a United States citizen and a resident of the

State of Arizona.  He is currently a death row inmate under the supervision of the ADC (Inmate

No. 056613).  He is held at the Arizona State Prison Complex–Eyman, 4374 East Butte Avenue,

Florence, Arizona, 85232.  Mr. Hedlund was sentenced to death for a crime committed before

November 23, 1992, and therefore may choose under Ariz. Rev. Stat. § 13-704(b) whether to be

executed by lethal injection or lethal gas.  He has not yet chosen his method of execution.

      10.    Plaintiff Michael Emerson Correll is a United States citizen and a resident of the

State of Arizona.  He is currently a death row inmate under the supervision of the ADC (Inmate

No. 051493).  He is held at the Arizona State Prison Complex–Eyman, 4374 East Butte Avenue,

Florence, Arizona, 85232. Mr. Correll was sentenced to death for a crime committed before

November 23, 1992, and therefore may choose under Ariz. Rev. Stat. § 13-704(b) whether to be

executed by lethal injection or lethal gas.  He has not yet chosen his method of execution.

      11.    Plaintiff Robert Wayne Murray is a United States citizen and a resident of the State

of Arizona.  He is currently a death row inmate under the supervision of the ADC (Inmate No.

094261).  He is held at the Arizona State Prison Complex–Eyman, 4374 East Butte Avenue,

Florence, Arizona, 85232.  Mr. Murray was sentenced to death for a crime committed before

November 23, 1992, and therefore may choose under Ariz. Rev. Stat. § 13-704(b) whether to be

executed by lethal injection or lethal gas.  He has not yet chosen his method of execution.

      12.    Plaintiff Theodore Washington is a United States citizen and a resident of the State

of Arizona.  He is currently a death row inmate under the supervision of the ADC (Inmate No.

065973).  He is held at the Arizona State Prison Complex–Eyman, 4374 East Butte Avenue,

Florence, Arizona, 85232.  Mr. Washington was sentenced to death for a crime committed

before November 23, 1992, and therefore may choose under Ariz. Rev. Stat. § 13-704(b)

whether to be executed by lethal injection or lethal gas.  He has not yet chosen his method of

execution.

      13.    Plaintiff Todd Smith is a United States citizen and a resident of the State of Arizona.

He is currently a death row inmate under the supervision of the ADC (Inmate No. 130941).  He

is held at the Arizona State Prison Complex–Eyman, 4374 East Butte Avenue, Florence,

3

Arizona, 85232.  Mr. Smith was sentenced to death for a crime committed after November 23, 1992 and therefore, under Ariz. Rev. Stat. § 13-704(b), he will be executed by lethal injection.

### ***Defendants***

14.    Defendant Janet Napolitano is the Governor of the State of Arizona and is being sued in her official capacity for prospective relief.

15.    Defendant Dora B. Schriro is the Director of the ADC and is being sued in her official capacity for prospective relief.

16.    Defendant Robert Stewart is the Warden of Arizona State Prison Complex–Eyman, where death row inmates are housed, and is being sued in his official capacity for prospective relief.

17.    Defendant Carson McWilliams is the Warden of Arizona State Prison Complex–Florence, where all executions in Arizona are performed, and is being sued in his official capacity for prospective relief.

18.    Defendants Does 1–50, Unknown Executioners, are the ADC's officers, successors in office, agents, contractors, and employees, along with those acting in concert with them, who have or will participate in Plaintiffs' executions by virtue of their roles in designing, implementing, and/or carrying out the lethal injection process.  Plaintiffs are ignorant of the true identities of the Unknown Executioners, but allege that when Plaintiffs discover their identities, Plaintiffs will amend this Complaint accordingly.

### **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

19.    Without conceding that the provisions for exhaustion of administrative remedies are applicable to their claims, Plaintiffs have effectively exhausted all administrative remedies for the issues contained in this Complaint to the extent that they were available and have satisfied the Prison Litigation Reform Act's exhaustion requirements pursuant to 42 U.S.C. § 1997e(a).

20.    Plaintiffs are not required to exhaust administrative remedies before bringing this Complaint because modification of the ADC's lethal injection protocol is not possible through the internal grievance process and therefore exhaustion is futile.

4

21.    Notwithstanding the fact that exhaustion of administrative remedies through a prison grievance policy is not required for this type of action, each of the Plaintiffs have, in an abundance of caution, filed grievances and fully exhausted all administrative remedies by completing the four-step grievance process as outlined in ADC Department Order 802: Inmate Grievance System.  The ADC has denied all relief requested by Plaintiffs and Plaintiffs aver and assert that all conditions precedent for bringing this suit have been met.  A chart detailing the Plaintiffs' requests for administrative relief, together with the ADC's denials, is attached hereto as Exhibit B.

## FACTUAL ALLEGATIONS

22.    All prior allegations set forth above are re-alleged as if set forth entirely herein.

23.    Plaintiffs are death row inmates and the ADC intends to carry out their execution by means of lethal injection.  Under Arizona law, death sentences shall be carried out "by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, under the supervision of the state department of corrections."  Ariz. Rev. Stat. § 13-704(a).  But "a defendant sentenced to death for an offense committed before November 23, 1992 shall choose either lethal injection or lethal gas . . .  If the defendant fails to choose either lethal injection or lethal gas, the penalty of death shall be inflicted by lethal injection."  Ariz. Rev. Stat. § 13-704(b).  The statute prescribes no specific drugs, dosages, drug combinations, or the manner of intravenous line access to be used in the execution process.  In addition, the statute fails to prescribe any certification, training, or licensure required for those individuals who participate in the execution process.  All of the details and methods involved in the execution process are to be determined at the ADC's sole discretion.

24.    On information and belief, the ADC intends to execute each of the Plaintiffs by means of lethal injection as set out in the November 30 Protocol.  The November 30 Protocol, and the manner and means by which lethal injection executions are currently performed, violate constitutional and statutory provisions enacted to prevent cruelty, pain, and torture.

A. **The Chemicals Chosen by the ADC for Lethal Injection Create an Excessive Risk that Condemned Inmates Will Suffer Excruciating Pain During Execution**

25.    The ADC's November 30 Protocol creates an unnecessary risk that condemned inmates will consciously experience pain and suffering during execution.  According to the protocol, the ADC intends to execute each of the Plaintiffs by injecting a sequence of three active drugs: (i) sodium thiopental; (ii) pancuronium bromide; and (iii) potassium chloride.  Two of these substances, pancuronium bromide and potassium chloride, will cause excruciating pain or suffering if administered to a condemned inmate who is not sufficiently anesthetized.

*Sodium Thiopental*

26.    The first chemical Defendants intend to administer to Plaintiffs during the lethal injection process is sodium thiopental ("thiopental"), an ultra-short acting barbiturate that in typical surgical doses produces only transient anesthesia.[2]  In the lethal injection process, thiopental is intended to anesthetize the condemned inmate, but if it is not successfully delivered into the condemned inmate's blood stream, thiopental will not provide a sufficient sedative effect for the duration of the execution process.  Failure to deliver the entire dose of thiopental is a foreseeable occurrence given the inadequacy of the ADC's procedures and training as outlined in the November 30 Protocol.  And, as a result of a failed delivery, the condemned inmate could remain conscious or regain consciousness and experience both conscious paralysis and asphyxiation induced by pancuronium bromide and the excruciatingly painful burning sensation induced by potassium chloride as it courses through the prisoner's veins, ultimately leading to cardiac arrest.

27.    Thiopental is sold in powder form and must be mixed into a solution to be injectable.  It must be mixed and administered by a qualified individual.  To deliver a five-gram dose of thiopental into an inmate's vein successfully, the executioner must prepare a solution that will deliver the dose in the proper concentration, a process that requires mixing multiple vials of thiopental powder with the correct quantity of dilutent, combining multiple vials into

---

[2] Thiopental is referred to in the November 30 Protocol as "Sodium Pentothal," a trade name used by Abbott Laboratories.

1    two larger syringes, and ensuring that the entire amount of powder is drawn into the syringes.  If

2    this process is not performed accurately, it will result in an incorrect concentration of thiopental,

3    which will prevent delivery of a reliable dose of anesthetic.  Yet, the ADC's November 30

4    Protocol does not reasonably assure that the personnel who will mix the thiopental, prepare the

5    syringes, and deliver the drugs have adequate and appropriate training and experience to

6    perform the tasks properly.  On information and belief, other states use licensed pharmacists or

7    physicians to mix the drugs, including thiopental, for lethal injections.

8            28.    Typically, thiopental is employed by medical professionals as a preliminary

9    anesthetic in the preparation for surgery while introducing a patient's breathing tube.  Once

10   anesthesia has been induced and the breathing tube inserted, other anesthetic drugs are used to

11   maintain the patient at a "surgical plane" of anesthesia throughout the surgical procedure.  Yet,

12   thiopental is the only anesthetic that will be administered by the ADC during Plaintiffs'

13   executions, despite the fact that even in animal euthanasia a longer-lasting and more stable

14   barbiturate, pentobarbital is recommended by the American Veterinary Medical Association

15   ("AVMA").  *See American Veterinary Medical Association, AVMA Guidelines on Euthanasia*

16   *(Formerly Report of the AVMA Panel on Euthanasia)* (June 2007), available at

17   http://www.avma.org/issues/animal _welfare/euthanasia.pdf, (hereinafter, "AVMA

18   Guidelines").  Similarly, under Arizona law, the preferred methods for executing impounded

19   animals includes euthanasia by sodium pentobarbital or a derivative sodium pentobarbital.  *See*

20   Ariz. Rev. Stat. Ann. § 11-1021.

21           ***Pancuronium Bromide***

22           29.    The second chemical Defendants intend to administer to Plaintiffs during the lethal

23   injection process is pancuronium bromide, also known by the trade name Pavulon.

24   Pancuronium bromide paralyzes all voluntary muscles, including the diaphragm, which stops

25   breathing by stopping air from being moved in and out of the lungs.  Pancuronium bromide is

26   not an anesthetic; that is, it is not a drug that prevents consciousness or sensation.  Rather,

27   pancuronium bromide, is a neuromuscular blocking agent that paralyzes the muscles but does

28   not affect the inmate's consciousness, cognition, or ability to feel pain.

30.     Pancuronium bromide unnecessarily increases the risk that a condemned inmate will be conscious during the injection of potassium chloride, an extremely painful drug.  Once paralyzed by pancuronium bromide, an inadequately anesthetized inmate will appear to be serene and unconscious throughout the execution procedure and will be unable to speak or move or otherwise inform the execution personnel that he is conscious and experiencing torturous pain.  Indeed, administered by itself to a conscious person, pancuronium bromide would cause the person to suffocate to death slowly while remaining fully conscious.

31.     Arizona is one of 30 states that prohibit the use of a neuromuscular blocking agent in the euthanasia of animals, either expressly and/or implicitly by mandating the use of alternative means such as sodium pentobarbital.  Ariz. Rev. Stat. Ann. § 11-1021.[3]  When pancuronium bromide is administered after an initial dose of thiopental, as is called for in the ADC's protocol for executions by lethal injection, it creates a real, gratuitous, and unacceptable risk that the condemned inmate will be paralyzed by the pancuronium bromide but conscious and aware of the pain caused by the final injection of potassium chloride.  As such, the combination of thiopental and pancuronium bromide creates the unconscionable possibility that a condemned inmate will be placed in a state of "chemical entombment" while he consciously experiences the agony of suffocation, the intense burning from potassium chloride as the chemical courses through his veins, and the pain of having a cardiac arrest.

32.     Pancuronium bromide serves no legitimate function in the context of an execution.  Rather, the chemical is used to prevent the executioners and witnesses from knowing whether the condemned inmate is adequately anesthetized.  In cases where the thiopental is not successfully delivered to the inmate's circulation and/or the condemned inmate is not adequately anesthetized, pancuronium bromide will create the appearance of a serene death while masking

---

[3] *See also* Ala. Code  § 34-29-131; Alaska Stat. § 08.02.050; Cal. Bus. & Prof. Code § 4827; Colo. Rev. Stat. § 18-9-201; Conn. Gen. Stat. § 22-344a; Del. Code Ann., Tit. 3, § 8001; Fla. Stat. §§ 828.058 and 828.065; Ga. Code Ann. § 4-11-5.1; 510 Ill. Comp. Stat., ch. 70, § 2.09; Kan. Stat. Ann. § 47-1718(a); La. Rev. Stat. Ann. § 3:2465; Me. Rev. Stat. Ann., Tit. 17, § 1044; Md. Code Ann., Crim. Law, § 10-611; Mass. Gen. Laws ch. 140, § 151A; Mich. Comp. laws § 333.7333; Mo. Rev. Stat. § 578.005(7); Neb. Rev. Stat. § 54-2503; Nev. Law § 374; N.J. Stat. Ann. 4:22-19.3; N.Y. Agric. & Mkts. § 374; Ohio Rev. Code Ann. § 4729.532; Okla. Stat., Tit. 4, § 501; Ore. Rev. Stat. § 686.040(6); R.I. Gen. Laws § 4-1-34; S.C. Code Ann. § 47-3-420; Tenn. Code Ann. § 44-17-303; Tex. Health & Safety Code Ann. § 821.052(a); W. Va. Code 30-10A-8; Wyo. Stat. Ann. 33-30-216.

1   the fact that the inmate is experiencing conscious paralysis, suffocation, and the agony of

2   cardiac arrest from the administration of potassium chloride.  The use of pancuronium bromide

3   is unnecessary to bring about the inmate's death.  Absent the use of pancuronium bromide, an

4   inmate undergoing execution would be able to indicate that he was still conscious or had

5   regained consciousness prior to the lethal dose of potassium chloride.

6        ***Potassium Chloride***

7        33.    The third and final chemical Defendants intend to administer to Plaintiffs during the

8   lethal injection process is potassium chloride, an extremely painful chemical which causes the

9   inmate's death by disrupting the heart's contractions, ultimately leading to cardiac arrest.  It is

10  medically indisputable and undisputed that an inadequately anesthetized inmate injected with

11  potassium chloride will experience torturous pain.  As potassium chloride travels through the

12  bloodstream from the site of injection towards the heart, the chemical activates sensory nerve

13  fibers inside the veins, causing a prolonged and intense burning sensation.  In the foreseeable

14  event that the condemned inmate is not adequately anesthetized throughout the execution

15  procedure, the potassium chloride will cause the inmate to consciously experience the agonizing

16  pain of this excruciatingly painful chemical coursing through his veins and of cardiac arrest,

17  while being incapable of expressing his suffering due to the paralytic effects of the pancuronium

18  bromide.

19       34.    Death by potassium chloride poisoning is viewed as being so inhumane that the

20  AVMA prohibits its use as the sole agent for animal euthanasia.  AVMA Guidelines at 12.  If

21  potassium chloride is to be used at all, the AVMA requires the practitioner administering the

22  potassium chloride to have the proper training and knowledge to ensure that the euthanized

23  animal has reached a surgical plane of anesthesia.  *See id*. ("It is of utmost importance that

24  personnel performing this technique are trained and knowledgeable in anesthetic techniques, and

25  are competent in assessing anesthetic depth appropriate for administration of potassium chloride

26  intravenously.")  The AVMA has established that the appropriate anesthetic depth for the use of

27  potassium chloride in animal euthanasia is "characterized by loss of consciousness, loss of

28  reflex muscle response, and loss of response to noxious stimuli." *Id.*  Conversely, the ADC's

9

November 30 Protocol lacks even the most basic protections or training regimen—safeguards that Arizona requires for non-veterinary personnel who perform animal euthanasia. Accordingly, the lethal injection procedures set forth in the November 30 Protocol used to execute inmates would be illegal if performed on household pets.

### B.   Deficiencies in the ADC's Lethal Injection Protocol Unnecessarily Risks Conscious and Agonizing Suffering

35.   Central features of the ADC's lethal injection protocol are substantially similar to procedures that various district courts in other states have recently found raise serious questions under the Eighth Amendment. *See, e.g., Morales v. Hickman*, 415 F. Supp. 2d 1037, 1046 (N.D. Cal. 2006), *aff'd*, 438 F.3d 926 (9th Cir. 2006), *cert. denied*, 546 U.S. 1163 (2006) (finding that administration of the same three-chemical sequence raises "substantial questions" that the condemned would be subjected to "an undue risk of extreme pain").

36.   The ADC's execution procedure, as set forth in the November 30 Protocol, is unacceptably deficient for a host of reasons that include, but are not limited to, the following:

(I)     Failure to set out the execution procedures in a sufficiently clear manner to ensure that the execution is carried out in a manner that does not cause unnecessary risk of pain and suffering;

(II)    Failure to adhere to contemporary standards of care in the administration of percutaneous central lines and to eliminate the risk that a cut-down may be used to create IV access;

(III)   Failure to ensure that the Department Director does not authorize deviations from the procedures that would further heighten the risk of unnecessary pain and suffering;

(IV)    Failure to assure adequate visualization of the IV sites and IV patency before and during an execution, and to properly assess anesthetic depth throughout an execution;

(V)     Failure to appropriately address the individual condemned inmate's particular medical condition and history;

(VI)    Failure to ensure the participation of qualified and trained personnel in the execution process;

(VII)   Failure to provide the appropriate physical conditions to safely perform the execution.

37.   The ADC's protocol is unclear and contradictory on numerous critical issues and, thus, greatly increases the risk that an execution will cause unnecessary pain and suffering to the inmate. For example, under the protocol, two sets of syringes containing the three-drug formula

are to be attached to a "3-Gang, 3-Way Manifold" and administered simultaneously by members of the execution team—one set flowing into the inmate, and the other flowing directly into a disposal bucket kept in a separate room.  On information and belief, the two sets are to be arranged in such a manner that the individuals administering the drugs contained in the two sets of syringes will not know whether their drugs will flow into the inmate or whether they will flow into the disposal bucket.   On information and belief, the purpose of this is to protect the executioners from knowing whether they have administered the fatal dose to the inmate.[4] However, the protocol also makes provision for a single back-up set of syringes to be kept in a "shadow box" in case more chemicals are needed during the execution.  The protocol provides no indication, however, how the executioners are to determine where on the "3-Gang, 3-Way Manifold" they are to attach the set of back-up syringes in order that the back-up chemicals flow into the inmate rather than directly into a disposal bucket.  So, for example, under the ADC's protocol, should more thiopental be needed to adequately anesthetize the inmate, there is at least an equal chance that the back-up thiopental will be administered directly into a disposal bucket rather than into the inmate.

38.    The protocol is also unclear as to the manner and means by which intravenous access will be achieved.  While the protocol states that "medical team" members will be responsible for administering a percutaneous central line, it does not clearly state that percutaneous central line placement is the standard or default manner of IV access, nor does it prohibit the possibility of using other methods of IV access.  For example, the protocol does not specify whether peripheral vein access, as opposed to a percutaneous central line, could be used.  Nor does it prohibit the use of the roundly-rejected "cut-down" method of IV access (i.e., surgically exposing the vein, inserting a catheter and closing the skin with suturing), a procedure that the ADC has used in the past.  This outdated procedure has been virtually abandoned in contemporary medical practice and is no longer used by most departments of corrections

---

[4] This method of protecting the executioners from knowing whether they have administered the fatal dose is inherently flawed.  Any adequately qualified medical practitioner will be able to immediately recognize whether the chemicals they are administering are flowing into the inmate or directly into a disposal bucket by the amount of resistance encountered in the administration of the chemicals.  Any person unable to recognize the flow of the chemicals in this manner would be utterly unqualified to administer the chemicals in the execution process.

11

nationwide in administering executions.  The ADC's past use of the outdated cut-down practice represents a blatant disregard for the infliction of pain and mutilation on condemned prisoners, yet the protocol does not prohibit the use of such a procedure.

39.    The November 30 protocol also fails to specify what factors, if any, are to be considered in choosing the manner of IV access that will be used.  Each method of access carries its own risks and should be used only in certain circumstances, and yet the protocol does not address whether the medical team should assess factors in favor of one method of IV access over another.

40.    The protocol appears to contemplate percutaneous central line placement as a default, without regard for the risks and dangers associated with that method. This method of IV access should only be used when medically indicated. Placement of a percutaneous central line is an invasive, complicated surgical procedure that is difficult to perform without significant training and experience.  Central line placement can cause great pain, as it requires placing the IV in a vein which can be anywhere from half an inch to several inches below the skin, and it can cause many painful and dangerous complications. The protocol allows, and the ADC has in the past used, a percutaneous central line in situations where such use has not been medically indicated.  For example, on information and belief, during Arizona's most recent execution in May 2007, ADC execution team members established an " injection site" in the right femoral vein of the condemned inmate's groin through percutaneous means (i.e., through the skin). This highly invasive method of intravenous access was, upon information and belief, not medically indicated, but rather chosen by the ADC for its own convenience.  Furthermore, under the protocol the ADC appears to be free to choose the area of the body in which to place the central line.  So, in addition to the groin, the ADC would be permitted to set a subclavian or jugular central line, highly risky procedures that should only be attempted by qualified personnel in a hospital setting.

41.    The protocol appears not to even contemplate use of peripheral IV access.  While it is true that it can be difficult to insert peripheral IVs in populations that have compromised veins from drug use, and that attempts to place a peripheral IV line should not be continued after a

12

1    certain period of unsuccessful attempts, peripheral IV access is safer as a default method of IV

2    access, because it does not involve the larger, deeper vein accessed in a central line placement,

3    and it is not an invasive surgical procedure.  It is an unacceptable practice to rely on central line

4    placement as the default method of IV access, and to Petitioner's knowledge, few if any other

5    states rely on central line placement as the default or sole method of IV access.

6        42.    Further heightening the risks caused by the protocol's lack of clarity and apparent

7    contradictoriness, the protocol grants broad discretion to the Department Director to deviate

8    from the procedures set out therein.  The Department Director has total discretion to modify its

9    execution procedures, including modifications to the drugs used, the amount of dosages, the

10   number of IV lines used to deliver the drugs, and the personnel involved in carrying out lethal

11   injection death sentences.   Where problems arise, therefore, the protocol leaves ultimate

12   supervisory and decision-making authority to a person whose position requires no medical

13   training whatsoever or even any training in the specific procedures required under the November

14   30 Protocol.  This raises the possibility, for example, that a "cut-down" could be authorized

15   upon failure to administer a percutaneous central line or that administration of the second two

16   drugs will be authorized despite a failure to adequately anesthetize the inmate.  Simply put, the

17   ADC is not subject to oversight in making changes or modifications to its lethal injection

18   protocol, nor are there appropriate checks and balances to ensure against unnecessary pain and

19   suffering during the execution process.

20       43.    Further, the ADC's execution protocol lacks numerous fundamental safeguards, thus

21   unnecessarily increasing the risk that Plaintiffs will suffer significant pain during the lethal

22   injection process.  For example, the ADC protocol identifies no appropriate procedures or

23   personnel for assessing whether, or ensuring that, the prisoner is properly and adequately

24   anesthetized prior to the administration of the pancuronium bromide and potassium chloride, as

25   would be required in any medical or veterinary procedure after administration of a sedative and

26   before the administration of a neuromuscular blocking agent or a painful potassium chloride

27   overdose.  And by failing to require the use of an IV drip, the protocol fails to establish

28   procedures for ensuring that the IV lines are flowing throughout the execution.

44.    The protocol also does not address appropriate monitoring of either the lethal injection apparatuses or the condemned inmate.  It does not make appropriate provision for ADC execution team members to visually monitor swelling, fluid leakage, or catheter dislodgement that would signal IV line infiltration, extravasation, migration, or failure. Likewise, the protocol does not address monitoring of the IV lines for patency.  Absent the ability to constantly visualize IV line and catheter failure, the execution team will simply administer the lethal injection drugs without regard to the adequacy of the condemned inmate's intravenous line, the sole means by which anesthetic drugs can reach the inmate. While the protocol makes provision for the use of a high-resolution camera to monitor anesthetic depth, this provision is wholly inadequate because, among others, it is impossible to distinguish the effects of pancuronium bromide from those of thiopental with a camera.  Nor is it possible, via a camera, to assess potential reawakening once pancuronium bromide has been administered.  It simply is not possible to assess anesthetic depth via a camera.  And it should additionally be noted that the high-resolution camera is inadequate to the task of monitoring the IV lines or catheter, because the camera either can focus on only one thing at a time, or its focus is so broad that it does not allow for clear visualization of any item.

45.    The protocol states that a medical team member shall enter the chamber periodically to assess anesthetic depth but it does not state which team member will do so, nor whether that team member will be qualified to assess anesthetic depth.  Moreover, the protocol sets a time-period of three minutes after the assessment of anesthetic depth prior to administration of the second and third chemicals.  This arbitrary time-period is unnecessarily risky.  If the team member assessing anesthetic depth is truly qualified then the team members need to be able to act upon his/her command, not be forced to wait an arbitrary amount of time during which anesthetic depth may change.  It is not safe to administer the pancuronium bromide and potassium chloride unless the inmate is adequately anesthetized.  The test must be that the inmate has reached the appropriate anesthetic depth, not that an arbitrary amount of time has elapsed.  In order to be meaningful, assessment of anesthetic depth must be performed throughout the execution, by a person qualified to do so.

14

46.   Moreover, the ADC's protocol fails to address the individual condemned inmate's particular medical condition and history.  The procedures make no provision for basing the amount of thiopental administered on well-recognized factors affecting its efficacy, such as body weight, body fat, prior drug usage, presence of other sedating agents, level of anxiety or stress, or food consumption in the hours before the execution.

47.   While the protocol states that the "medical team" will consist of medically trained personnel including "physician(s), nurse(s) and/or emergency medical technician(s)" it provides no specificity as to the criteria by which the personnel will be selected, their required experience or training.   Nor does the protocol set out which types of "medically trained personnel" are required to do which types of procedures.  Consequently, under the ADC's current protocol, inappropriate personnel could be solely responsible for the placement of the percutaneous central line (or other types of IV access) and making critical judgments regarding line patency and drug administration.

48.   The ADC's execution protocol fails to set forth sufficient details regarding the credentials, certification, licensure, experience, or proficiency of the personnel entrusted to prepare the drugs used in carrying out execution by lethal injection.  Preparation of drugs, particularly for intravenous use, is a highly technical undertaking which requires training in pharmaceutical methods and calculations.  The protocol's failure to require that the execution personnel possess such certification, licensure, or experience, as well as its failure to require such training, greatly exacerbates the risk that drugs will be improperly administered and condemned inmates will consciously experience excruciating pain during the lethal injection process.

49.   The ADC's protocol also fails to specify the type of training that the selected personnel must under-go and the proficiency level that the personnel must reach though that training.  This further increases the risk that condemned inmates will suffer excruciating pain during the execution process.

50.   The protocol, therefore, makes no provision for qualified personnel to monitor the anesthetic depth of the condemned inmate during the execution.  Typically, anesthetic care in

15

1    the United States is performed by individuals who have received advanced training in the

2    medical subspecialty of anesthesiology, such as physicians who have already completed their

3    residency in the specialty of anesthesiology or nurses who have trained to become Certified

4    Registered Nurse Anesthetists.  Yet there is no guarantee that the ADC personnel engaged in

5    carrying out executions will be either qualified or trained to monitor anesthetic depth,

6    undermining any effort to reasonably ensure that the condemned inmate is fully anesthetized

7    prior to the administration of the pancuronium bromide and potassium chloride.

8        51.    On March 29, 2006, the ADC's general counsel, Robert Myers, told Human Rights

9    Watch, a human rights monitoring non-governmental organization, that while for a number of

10   years Arizona used anesthesiologists to inject drugs used for lethal injection executions, that

11   function is no longer undertaken by a doctor.[5]  Thus, in violation of the contemporary standards

12   of decency, the ADC has actually decreased, rather than increased, the skill and training of the

13   persons involved in executions.  And there is no guarantee in the protocol that such a practice

14   will cease.

15       52.    The protocol also fails to mandate proper physical conditions upon which to carry

16   out the execution.  For example, upon information and belief, the ADC intends to carry out the

17   execution using extended IV lines and other equipment that are medically inappropriate to

18   perform such a procedure.  The ADC intends to use, for example, IV lines that have been rigged

19   together so that the executioners are not in the execution chamber at the time of the execution,

20   despite the fact that, on information and belief, the IV lines are not designed for such a purpose.

21   And, among others, the protocol does not ensure that there is appropriate lighting and viewing

22   range with which to safely perform the execution.  Moreover, in previous executions performed

23   by the ADC the execution has been carried out while the inmate was covered with a sheet, thus

24   obscuring proper visualization of IV access and patency.  This practice, which serves no

25   legitimate purpose and is unnecessarily risky, is not prohibited under the protocol.

26

27

28
_____
[5] Human Rights Watch, *So Long as They Die:  Lethal Injections in the United States*, Volume 18 No. 1(G) at 40
(April 2006), *available at*  http://hrw.org/reports/2006/us0406/us0406webwcover.pdf.

16

1

2

**C.      Lethal Gas Does Not Provide an Adequate Constitutional Alternative to Lethal Injection.**

53.      Ariz. Rev. Stat. § 13-704(b) provides that Messrs. Beaty, Correll, Dickens, Hedlund, Murray and Washington must choose between lethal injection and lethal gas as their methods of execution.  None has done so.

54.      Execution by lethal gas as practiced in Arizona is unconstitutional under the Eighth and Fourteenth Amendments.  *LaGrand v. Stewart*, 173 F.3d 1144 (9th Cir. 1999) *vacated on other grnd's* 526 U.S. 115 (1999) (petitioner's choice of lethal gas waived his right to challenge the method's constitutionality); *see also Fierro v. Gomez*, 77 F.3d 301, 309 (9th Cir. 1996) *vacated on other grnd's* 519 U.S. 918 (1996) (remanded for reconsideration in light of newly adopted lethal gas execution procedures).

55.      Accordingly, lethal gas does not provide an adequate constitutional alternative to lethal injection for Messrs. Beaty, Correll, Dickens, Hedlund, Murray and Washington.

## COUNT I

**VIOLATION OF RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT AND TO BE FREE FROM ARBITRARY AND CAPRICIOUS PROCESSES PURSUANT TO THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**

56.      All prior allegations set forth above are re-alleged as if set forth entirely herein.

57.      Defendants are acting under color of Arizona law in subjecting Plaintiffs to an arbitrary and capricious method of execution that creates an unnecessary risk of inflicting excruciating and prolonged pain, and by designing and administering a process under which they will inject Plaintiffs with chemicals in amounts, combinations, and by a protocol that clearly risks conscious suffering and pain in the execution of a sentence of death, thereby depriving Plaintiffs of their rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution to be free from cruel and unusual punishment and to be free from arbitrary and capricious procedures.

58.      The ADC's protocol violates Plaintiffs' rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because (i) the protocol creates the

17

1  unjustified risk of unnecessary physical and psychological pain; (ii) the protocol does not

2  comport with contemporary norms and standards of society; and (iii) the protocol offends the

3  dignity of the person and society.

4       59.   The failure of the ADC to take sufficient measures to minimize the risk of

5  unnecessary, extreme and excruciating pain and mutilation, when such risk could easily be

6  prevented by removing the risks in the November 30 Protocol, violates the Fifth, Eighth, and

7  Fourteenth Amendments to the United States Constitution.

8  **<u>PRAYER FOR RELIEF</u>**

9     WHEREFORE, Plaintiffs pray as follows:

10       1.     Temporary, preliminary, and permanent injunctive relief to enjoin Defendants,

11  their officers, agents, servants, employees, and all persons acting in concert with them from

12  executing Plaintiffs by legal injection using the ADC's November 30 Protocol, or any similar

13  protocol;

14       2.     In the event that the November 30 protocol, or any similar protocol, is not enjoined

15  in its entirety as violating the Fifth, Eighth, and Fourteenth Amendments, temporary,

16  preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents,

17  servants, employees, and all persons acting in concert with them from administering

18  unnecessary drugs that cause excruciating and prolonged pain during the execution process;

19       3.     In the event that the November 30 protocol, or any similar protocol, is not enjoined

20  in its entirety as violating the Fifth, Eighth, and Fourteenth Amendments, temporary,

21  preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents,

22  servants, employees, and all persons acting in concert with them from allowing personnel who

23  lack sufficient training, credentials, certification, experience, or proficiency to conduct the lethal

24  injection procedure;

25       4.     That the Court conduct appropriate and necessary evidentiary hearings and

26  discovery to permit Plaintiffs to prove their constitutional claims;

27       5.     Reasonable attorney's fees pursuant to 42 U.S.C. § 1983 and the laws of the

28  United States;

1    6.    Costs of the suit; and

2    7.    Any and all other such relief as this Court deems just, proper, and equitable.

3

4    Respectfully submitted this 7th day of January 2008,

5

6                                    O'MELVENY & MYERS LLP

7                                    s/Thomas G. Carruthers_____
                                     Thomas G. Carruthers
8                                    Florence M. Beauboeuf
                                     7 Times Square
9                                    New York, New York  10036
                                     Telephone:    (212) 326-2000
10                                   Facsimile:    (212) 326-2061

11                                   OFFICE OF THE FEDERAL PUBLIC
                                     DEFENDER FOR THE DISTRICT OF
12                                   ARIZONA

13                                   s/Dale A. Baich_____
                                     Jon M. Sands
14                                   Dale A. Baich
                                     Megan Moriarty
15                                   850 West Adams Street
                                     Phoenix, Arizona  85007
16                                   Telephone:    (602) 382-2700
                                     Facsimile:    (602) 382-2801
17

18                                   Attorneys for Plaintiffs GREGORY DICKENS,
                                     DONALD EDWARD BEATY, CHARLES M.
19                                   HEDLUND, MICHAEL EMERSON CORRELL,
                                     ROBERT WAYNE MURRAY, THEODORE
20                                   WASHINGTON, and TODD SMITH

21

22

23

24

25

26

27

28

19

1

**CERTIFICATE OF SERVICE**

2

3          I hereby certify that on January 7, 2008, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electric Filing to the following CM/ECF registrants:

4

5

6                                        TERRY GODDARD
                                        Attorney General
                                        KENT E. CATTANI

7                                        Chief Counsel, Capital Litigation
                                        PATRICIA NIGRO

8                                        Assistant Attorney General, Capital Litigation
                                        1275 W. Washington

9                                        Phoenix, AZ 85007-2997

10                                       *Attorneys for Defendants*

11      O'MELVENY & MYERS LLP

12      s/Florence M. Beauboeuf_____

13      Florence M. Beauboeuf

14      *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28