1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                    FOR THE DISTRICT OF ARIZONA

8

9    Gregory Dickens, Donald Edward Beaty, )    No. CV07-1770-PHX-NVW
     Charles M. Hedlund, Michael Emerson  )
10   Correll, Robert Wayne Murray,        )    **ORDER**
     Theodore Washington, and Todd Smith, )
11                                         )
                   Plaintiffs,             )
12                                         )
     vs.                                   )
13                                         )
                                           )
14   Janice K. Brewer, Governor of the State )
     of Arizona; Charles L. Ryan, Interim  )
15   Director of the Arizona Department of  )
     Corrections; Robert Stewart, Warden,  )
16   Arizona State Prison Complex-Eyman;    )
     Carson McWilliams, Warden, Arizona     )
17   State Prison Complex-Florence, and      )
     Does 1-50, Unknown Executioners, in    )
18   their official capacities as Employees, )
     Contractors and/or Agents of the Arizona )
19   Department of Corrections,              )
                                           )
20                 Defendants.             )
                                           )
21   _____ )

22
          Before the Court is Defendants' Motion for Summary Judgment (doc. #94).
23
     **I.    Procedural Background**
24
          Plaintiffs are death row inmates under the supervision of the Arizona Department
25
     of Corrections ("ADC").  Plaintiff Todd Smith was sentenced to death for a crime
26
     committed after November 23, 1992, and therefore will be executed by lethal injection
27
     under A.R.S. § 13-757.  Plaintiffs Gregory Dickens, Donald Edward Beaty, Charles
28

1   Hedlund, Michael Emerson Correll, Robert Wayne Murray, and Theodore Washington
2   were sentenced to death for crimes committed before November 23, 1992, and therefore
3   may choose under A.R.S. § 13-757(b) whether to be executed by lethal injection or lethal
4   gas.  They have not yet chosen the method of execution.

5          Plaintiffs brought this action under 42 U.S.C. § 1983 for alleged violations and
6   threatened violations of Plaintiffs' rights to be free from cruel and unusual punishment
7   under the Eighth and Fourteenth Amendments to the United States Constitution and for
8   alleged violations and threatened violations of Plaintiffs' rights to be free from arbitrary
9   and capricious ADC protocols and procedures under the Fifth and Fourteenth
10  Amendments to the United States Constitution.[1]  Plaintiffs allege that "lethal injection, as
11  that method of execution is currently administered in Arizona, carries a substantial risk of
12  inflicting torturous pain and suffering upon condemned inmates."  They further allege
13  that "the nature of the chemicals used by Defendants to effectuate execution by lethal
14  injection, coupled with Defendants' failure to implement sound alternative procedures
15  and to guarantee the use of properly trained and qualified personnel, creates a highly
16  foreseeable and substantial risk that Plaintiffs will experience excruciating pain and
17  suffering during execution."  They seek equitable and injunctive relief to prevent
18  Defendants from carrying out their executions by lethal injection as that method of
19  execution currently is performed in Arizona or any similar protocol.

20         Defendants moved for summary judgment on January 9, 2009, and Plaintiffs
21  responded on February 12, 2009.  In reply, on March 2, 2009, Defendants stated that the
22  ADC was willing to amend its lethal injection protocol in several respects.  On March 10,
23  2009, Plaintiffs were granted leave to file a sur-reply.  The parties were further ordered to
24  meet and confer regarding the status of the case and to clarify which issues remained in
25  dispute for determination.

26
27  _____

28         [1]Briefing by both sides is limited to arguments under the Eighth Amendment.

On April 9, 2009, the parties filed a Joint Report (doc. #131) identifying the issues briefed and resolved, issues briefed and not resolved, and unresolved issues arising from Defendants' newly proposed amendments to Arizona's lethal injection protocol. Exhibit A to the Joint Report states the amendments to Arizona's lethal injection protocol upon which the parties have agreed. "Arizona Protocol" as used herein means Arizona's lethal injection protocol defined by what is referred to in briefing as Attachment F to Department Order 710, titled "Preparation and Administration of Chemicals," dated November 1, 2007,[2] and now modified by Exhibit A of the Joint Report (doc. #131). Defendants have not filed a complete document incorporating the agreed upon amendments. On June 24, 2009, the Court heard oral argument on Defendants' Motion for Summary Judgment.

## II.   Legal Standard for Summary Judgment

The court should grant summary judgment if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must produce evidence and persuade the court there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To defeat a motion for summary judgment, the nonmoving party must show that there are genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A material fact is one that might affect the outcome of the suit under the governing law. *Id.* at 248. A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the moving party has carried its burden under rule 56(c), the nonmoving party must produce evidence to support its

---

[2] Attachment F to Department Order 710, titled "Preparation and Administration of Chemicals," dated November 1, 2007, is Exhibit F to the Statement of Facts in Support of Defendants' Motion for Summary Judgment (doc. #92-9 at 17-23) and Exhibit 3 to the Declaration of Benjamin D. Petrosky in Opposition to Defendants' Motion for Summary Judgment (doc. #108-2).

claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*

In this context, the court presumes the nonmoving party's evidence is true and draws all inferences from the evidence in the light most favorable to the nonmoving party. *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987). If the nonmoving party produces direct evidence of a genuine issue of fact, the court does not weigh such evidence against the moving party's conflicting evidence, but rather submits the issue to the trier of fact for resolution. *Id.*

**III.    Facts Undisputed for Summary Judgment**

In Arizona, executions are conducted at Housing Unit 9 of the Arizona State Prison Complex in Florence, Arizona. Arizona's method of execution is by lethal injection. A.R.S. § 13-757(A). If a defendant committed his crime before November 23, 1992, he has the choice of either lethal injection or lethal gas. A.R.S. § 13-757(B). If the defendant fails to choose either lethal injection or lethal gas, the penalty will be inflicted by lethal injection. *Id.* Under Arizona law, the identity of executioners and those who perform ancillary functions in an execution is confidential and not subject to disclosure. A.R.S. § 13-757(C). "If a person who participates or performs ancillary functions in an execution is licensed by a board, the licensing board shall not suspend or revoke the person's license as a result of the person's participation in an execution." A.R.S. § 13-757(D).

**A.    Department Order 710**

The ADC's Department Order 710 "establishes procedures for planning and carrying out the execution of a person convicted of a capital offense and sentenced to death." Department Order 710 provides:

> These procedures shall be followed as written unless deviation or adjustment is required, as determined by the Arizona Department of

Corrections (Department).  This Department Order outlines internal procedures and does not create any legally enforceable rights or obligations. Department Order 710 establishes general and specific timelines, including actions to be taken thirty-five days before the execution, twenty-one days before the execution, seven days before the execution, two days before the execution, twenty-four hours before the execution, twelve hours before the execution, and after the execution.

Department Order 710 also establishes and assigns responsibilities to the following teams:  Command, Housing Unit 9 Team, Pre/Post Execution Restraint Team, Special Operations Team, Maintenance Response Team, Critical Incident Response Team, Traffic Control Team, Escort Team, Victim Services Team, and Population Assessment. Department Order 710 establishes the procedure for recommending and selecting ADC staff and others to assist with the execution.  Thirty-five days before the execution, the Deputy Division Director for Offender Operations will evaluate the teams' composition and the Wardens' recommendations and forward final recommendations to the Division Director for Offender Operations.  The Division Director for Offender Operations will consider each proposed team member's personnel file, "medical and mental health status," and current work location.  "Special consideration may be given to staff with pertinent specialized training and qualifications."  No employee who has had any disciplinary action within the past twelve months, has less than two years satisfactory employment with the Department, or has a legal relationship with the inmate, his family, or the crime victim(s) will be considered.  "The selection process shall consist of a preliminary screening by a panel followed by an interview of each proposed team member conducted prior to the final selection of team members."  Thirty-five days before the execution, the Division Director for Offender Operations also will identify and assign teams' leaders and members, activate the teams, arrange for the participation of qualified medical personnel, and activate "the training schedule ensuring staff participating in the execution receives adequate training, written instruction and practice, all of which is documented."

1    Twenty-one days and seven days before the execution, the Division Director for

2 Offender Operations will continue tabletop and live exercises with the previously

3 identified teams.  Two days before the execution, the Division Director for Offender

4 Operations "[s]chedules and conducts on-site simulation exercises, modifying practices as

5 warranted."  Twenty-four hours before the execution, "[o]n-site simulation exercises

6 continue."  "No later than seven days after the execution, the Division Director for

7 Offender Operations will meet with Command Center staff and execution team leaders to

8 evaluate operations, identify opportunities to revise and improve written instruction, then

9 brief the Director."

10    The Critical Incident Response Team consists of twenty team members and a team

11 leader.  The leader is the Employee Assistance Program Administrator or designee.  The

12 team members are trained responders.  The team's primary function is "to educate staff

13 regarding possible psychological responses and effective coping mechanisms to affected

14 staff at all levels in the Department prior to, during and after the execution."  The team

15 also will provide ongoing follow-up contact with staff.  Thirty-five days before the

16 execution, Critical Incident Response Team members will identify and speak with

17 interested and affected staff.  Twenty-four hours before the execution, the team is

18 activated statewide and is on-site at ASPC-Florence and ASPC-Eyman or ASPC-

19 Perryville.

20    The Special Operations Team consists of seven "medically trained" team members

21 and a Team Leader.  One member is to be selected to observe the procedure and serve as

22 the Recorder.  The remaining six team members will dispense the chemicals.  The

23 "[p]rimary function of the Special Operations Team is to implement the protocols

24 associated with the execution with its primary duty being the administration of the

25 chemicals."

26    Regarding administration of the chemicals, Department Order 710 states only:

27 "The Director will instruct the disbursement of chemicals to begin the prescribed means."

28 Department Order 710 does not specifically reference an Attachment F or procedures

1   titled "Preparation and Administration of Chemicals."  It does, however, provide that

2   within ninety days of the effective date of the Department Order, the Division Director

3   for Offender Operations shall update and maintain a restricted technical manual including

4   the following:  responsibilities of Offender Services; responsibilities of ASPC-Florence,

5   ASPC-Eyman, and ASPC-Perryville; Death Watch procedures; and execution procedures

6   and medical protocol.  Department Order 710 does not identify its effective date.

7       **B.    The Arizona Protocol**

8       The Arizona Protocol (referred to in briefing as Attachment F to Department Order

9   710 and now modified by joint agreement of the parties) provides, in part:

10      A.    Confidentiality and Involvement

11          1.    . . . To preserve the anonymity of personnel involved, each
                  Housing Unit 9, Special Operations and Medical Team
12                member will be assigned an identifier.

13          2.    All team members serve on a strictly voluntary basis.  At any
                  point before, during or after an execution any team member
14                may decline to participate or participate further without
                  additional notice and explanation or repercussion.
15

16      B.    Medical Team Members – Selection and Training

17          1.    The Medical Team consists of physician(s), physician
                  assistant(s), nurse(s), emergency medical technician(s),
18                paramedic(s), military corpsman, phlebotomist(s) or other
                  medically trained personnel including those trained in the
19                United States Military.  All team members shall have at least
                  one year of current and relevant professional experience in
20                their assigned duties on the Medical Team.  Two Medical
                  Team members (IV team) will be assigned the responsibility
21                of inserting the IV catheters.

22          2.    The Medical Team members shall be selected by the Division
                  Director for Offender Operations with the approval of the
23                Director of the Arizona Department of Corrections
                  (Department Director).  Selection of the team members shall
24                include a review of the proposed team member's professional
                  qualifications, training, experience, professional license(s)
25                and certification(s), criminal history, and personal interview.
                  Licensing and criminal history reviews shall be conducted,
26                prior to contracting, annually and upon the issuance of a
                  Warrant of Execution.

27          3.    The Division Director for Offender Operations with the
                  approval of the Department Director shall designate the
28                Medical Team Leader.  The Division Director for Offender

Operations and the Medical Team Leader shall ensure that all team members thoroughly understand all provisions contained herein as written and by practice.

4.    The Medical Team shall be responsible for inserting the IV catheters, ensuring the line is functioning properly throughout the procedure, mixing the chemicals, preparation of the syringes, monitoring the inmate (including the level of consciousness and establishing the time of death), and supervising the administration of the chemicals as well as other duties that may be assigned by the Department Director.

5.    IV team members and non-medically licensed team members shall participate in a minimum of ten (10) execution rehearsals per year with the Special Operations Team.  All team members shall have participated in at least two (2) execution rehearsals prior to participating in an actual execution.

6.    The Division Director for Offender Operations and the Medical Team [L]eader shall ensure that all team members thoroughly understand all provisions contained herein as written and by practice.

7.    Any documentation establishing qualifications, including training of the team members, shall be maintained by the Department Director or designee.

C.    Special Operations Team Members – Selection and Training

1.    The primary duty of the Special Operations Team is to administer the chemicals.

2.    The Special Operations Team consists of seven medically trained team members and a Team Leader.

3.    The Special Operations Team shall be selected by the Division Director for Offender Operations with the approval of the Department Director.  Each proposed Special Operations Team member shall undergo a screening panel and an individual interview prior to their final selection.

4.    The Special Operations Team Leader will be designated by the Division Director to oversee the team.

5.    The Special Operations Team Leader will select one Special Operations Team member to observe the procedure and serve as the Recorder.  The remaining six team members will dispense the chemicals as described below.

6.    The Special Operations Team shall undergo annual training.  In the event that a Warrant of Execution is issued, the Special Operations Team will also train weekly up to the date of the execution.  The training shall ensure all team members thoroughly understand the procedures as written and by

practice.  All team members will be trained to perform all Special Operations Team duties.

D.     Obtaining Chemicals and Equipment

1.     Upon receipt of the Warrant of Execution, the Division Director for Offender Operations or designee shall obtain the inmate's weight, ascertain the inmate's primary language, identify any special accommodations, ensure all equipment necessary to properly conduct the execution is in good working order and that the chemicals are ordered and arrive.

2.     The chemicals shall be stored in a secured locked area that is temperature regulated and monitored to ensure compliance with manufacturer specifications, under the direct control of the Housing Unit 9 Team Leader.

3.     The Special Operations Team Leader will ensure that backup equipment for all medical equipment utilized during the procedure including a backup electrocardiograph and complete set of backup chemicals, is on site and immediately available.  The Special Operations Team Leader shall also ensure that all equipment is checked quarterly by department medical staff and is functioning properly.

E.     Preparation of Chemicals[3]

1.     At the appropriate time, the Housing Unit 9 Team Leader shall transfer custody of the chemicals to the Medical Team Leader in order for the Medical Team to begin the chemical and syringe preparation in the chemical room.

2.     The Medical Team shall be responsible for preparing and labeling [33] sterile syringes in a distinctive manner identifying the specific chemical contained in each syringe by i) assigned number, ii) chemical name, iii) chemical amount, and iv) the designated color, as set forth in the Chemical Chart below.

---

[3]On April 9, 2009, Defendants agreed to discontinue use of a false line, which prevented Special Operations Team members from knowing whether by pushing a syringe they were administering lethal injections to the inmate or to the false line running to a disposal bucket.  Defendants also agreed to reduce the concentration of sodium pentothal (also referred to as sodium thiopental) from 5% to 2.5%, which requires four syringes of sodium pentothal instead of two.  Although corresponding revisions were made to the Chemical Chart in Section E, Section G and the narrative portion of Section E were not revised to correspond with the amended Chemical Chart.

# CHEMICAL CHART

[Three identical sets of eleven syringes will be prepared.  Each set includes four syringes of 1.25gm sodium pentothal (a total of 5 grams in a clinical concentration of 2.5%), two syringes of 60mg pancuronium bromide, two syringes of 120mEq potassium chloride, and three syringes of 60mL heparin/saline.]

. . . .

11.     The quantities of the chemicals prepared and administered may not be changed in any manner without prior approval of the Department Director.

. . . .

14.     The Special Operations Team member that is selected by the Special Operations Team Leader to observe the procedure and serve as the Recorder will be responsible for completing the Sequence of Chemicals form using their assigned identifier. The Recorder shall verify that the full amount of each chemical is prepared, administered and that it is administered in the order set forth in the Chemical Chart.  Any deviation from the written procedure shall be noted and explained on the form.

E. [sic] Movement and Monitoring of Inmate

. . . .

3.     The inmate may be offered a mild sedative based on the inmate's need.  The sedative shall be provided to the inmate no later than four hours prior to the execution, unless it is determined medically necessary.

4.     At the designated time, the inmate will be brought into the execution room and secured on the medical table by the prescribed means.  A microphone will be affixed to the inmate's shirt to enable the Medical Team and Special Operations Team Leader to verbally communicate directly with the inmate and hear any utterances or noises made by the inmate throughout the procedure.  The Special Operations Team Leader will confirm the microphone is functioning properly and that the inmate can clearly hear from their affixed position and be heard in the chemical room.

5.     The inmate will be positioned to enable the Medical Team and Special Operations Team Leader to directly observe the inmate and to monitor the inmate's face with the aid of a high resolution color NTSC CCD camera with 10x Optical zoom lens with pan tilt capability and a 19-inch resolution color monitor.

6.     The Division Director for Offender Operations shall ensure there is a person present throughout the procedure who is able

to communicate with the inmate in the inmate's primary language if it is other than English.  This person will be positioned to clearly see, hear and speak to the inmate throughout the procedure.

7.     After the inmate has been secured to the execution table, the Special Operations Team Leader shall personally check the restraints which secure the inmate to the table to ensure they are not so restrictive as to impede the inmate's circulation, yet sufficient to prevent the inmate from manipulating the catheter and IV lines.

8.     The Medical Team shall confirm that the electrocardiograph is functioning properly, that the proper graph paper is used, and will attach the leads from the electrocardiograph to the inmate's chest once the inmate is secured to the medical table.  A backup electrocardiograph shall be on site and readily available if necessary.  Prior to the day of and on the day of the execution both electrocardiograph instruments shall be checked to confirm they are functioning properly.

9.     Throughout the procedure the Medical Team shall continually monitor the inmate's level of consciousness and electrocardiograph readings, maintaining constant observation of the inmate utilizing direct observation, audio equipment, camera and monitor as well as any other medically approved method(s) deemed necessary by the Medical Team.

10.    There shall be sufficient lighting and physical space in the chemical room and the execution chamber to enable team members to function properly and to observe the inmate.

F.     Intravenous Lines

1.     The IV team members shall site and insert a primary IV catheter and a backup IV catheter in two separate locations in the peripheral veins utilizing appropriate medical procedures.  The insertion sites in order of preference shall be:  arms, hands, ankles and feet as determined medically appropriate by the Medical Team Leader.  Both primary and backup IV lines will be placed unless in the opinion of the Medical Team Leader it is not possible to reliably place two peripheral lines.

2.     To ensure proper insertion in the vein, the IV team should watch for the dark red flashback of blood at the catheter hub in compliance with medical procedures.

3.     The IV team members shall ensure the catheter is properly secured with the use of tape or adhesive material, properly connected to the IV line and out of reach of the inmate's hands.  A flow of Heparin/Saline shall be started in each line and administered at a slow rate to keep the line open.

4.     The primary IV catheter will be used to administer the chemicals and the backup catheter will be reserved in the

event of the failure of the first line.  Any failure of a venous access shall be immediately reported to the Department Director.

5.      The IV catheter in use shall not be covered and shall remain visible throughout the procedure.

6.      The warden shall physically remain in the room with the inmate throughout the administration of the chemicals in a position sufficient to clearly observe the inmate and the primary and backup IV sites for any potential problems and shall immediately notify the Medical Team Leader and Department Director should any issue occur.  Upon receipt of such notification, the Director will stop the proceedings and take all steps necessary in consultation with the Medical Team Leader prior to proceedings [sic] further with the execution.

7.      Should the use of the backup IV catheter be determined to be necessary, a complete set of backup chemicals should be administered in the backup IV as set forth in the chemical chart.

8.      Should it become necessary to use an alternate means of establishing an IV line because, in the opinion of the Medical Team [L]eader, it is not possible to reliably place a peripheral line in the inmate, a Medical Team member may utilize a percutaneous central line in the inmate's femoral vein in the thigh if, in the opinion of a qualified Medical Team member, such a line may be reasonably placed.  The Medical Team member responsible for placing a percutaneous central line in the inmate's femoral vein shall have at least one year of regular and current professional experience conducting that procedure.  The Medical Team member will place the percutaneous central line catheter in the inmate's femoral vein utilizing appropriate medical procedures which includes the use of ultrasound to assist in properly inserting the catheter and anesthetic such as Lidocaine.  The Medical Team member shall ensure the catheter is properly secured with the use of tape or adhesive material, properly connected to the IV line and out of reach of the inmate's hands.  This line shall be utilized for the administering of all chemicals.

9.      Upon successful insertion of the catheter into the inmate's femoral vein, a Medical Team member will inject a solution of Heparin and Saline into the catheter to ensure patency of the catheter.

G.      Administration of Chemicals

1.      At the time execution is to commence and prior to administering the chemicals, the Department Director will reconfirm with the Attorney General or designee and the Governor or designee that there is no legal impediment to proceeding with the execution.  Upon receipt of oral

confirmation that there is no legal impediment, the Department Director will order the administration of chemicals to begin.

2.    Upon receipt of the Department Director's order and under observation of the Medical Team, the Special Operations Team will begin dispensing the chemicals in the order and amounts set forth in the Chemical Chart.

3.    A Medical Team member shall mark the EKG graph paper at the commencement and completion of the administration of each chemical.  The assigned identifier of the Medical Team member monitoring the electrocardiograph shall be noted at each juncture.

4.    [This paragraph describes the use of a false line, which Defendants have agreed to discontinue using.][4]

5.    Special Operations Team member[] 1 [] will administer the full dose of Sodium Pentothal from syringes 1A, 2A, [3A, and 4A] followed by the Heparin/Saline from syringe[] [5A].  The Heparin/Saline is administered as a secondary precaution to further ensure the line is functioning properly and flushed between each chemical.

6.    After the Sodium Pentothal and Heparin/Saline have been administered and before the Special Operations Team members begin administering the Pancuronium Bromide, the Medical Team shall confirm the inmate is unconscious by sight and sound, utilizing the audio equipment, camera and monitor.  A Medical Team member, dressed in a manner to preserve their anonymity, will enter into the room where the inmate is located to physically confirm the inmate is unconscious, and that the catheter and lines are affixed and functioning properly, using methods deemed medically necessary.

7.    No further chemicals shall be administered until the Medical Team has confirmed the inmate is unconscious and has verbally advised the Department [Director] and Special Operations Team Leader of the same.

8.    In the unlikely event that the inmate is still conscious, the Medical Team shall assess the situation to determine why the inmate is conscious.  This information shall be communicated to the Department Director along with all Medical Team input.  The Department Director will determine how to proceed.

9.    If deemed appropriate, the Department Director will instruct the Special Operations Team to administer an additional 5 gm

---

[4]See note 3.

of Sodium Pentothal, [1.25 gm] each from syringes [1B, 2B, 3B, and 4B]. This should be followed by the Heparin/Saline from syringe [5B]. Upon administering the complete second round of Sodium Pentothal and Heparin/Saline, the Medical Team will again use all necessary medically approved methods to confirm the inmate is unconscious and verbally advise the Special Operations Team Leader of the same. Only upon receipt of oral confirmation from the Medical team that the inmate is unconscious will the Special Operations Team proceed with administering the next chemical.

10. After the Medical Team has confirmed the inmate is and remains unconscious and three minutes have elapsed since commencing the administration of the Sodium Pentothal, Special Operations Team member[] [2] shall begin administering the full dose of Pancuronium Bromide from syringes [6A and 7A] followed by the Heparin/Saline flush from syringe[] [8A], as set forth in the Chemical Chart. If it is deemed necessary to administer a second dose of Sodium Pentothal, the three minutes will be calculated from the beginning of the administration of the second dose of Sodium Pentothal.

11. After the Medical Team reconfirms that the inmate is unconscious, Special Operations Team member[] [3] shall begin administering the full doses of the remaining chemicals, Potassium Chloride from syringes [9A and 10A] followed by the Heparin/Saline from syringe[] [11A] as set forth in the Chemical Chart.

12. If, after administering the second injection of Potassium Chloride and the subsequent Heparin/Saline, the electrical activity of the inmate's heart has not ceased, the additional [P]otassium [C]hloride contained in syringes [9B and 10B] shall be administered followed by the Heparin/Saline from syringe [11B].

13. When all electrical activity of the heart has ceased as shown by the electrocardiograph, the Medical Team following standard medical practices, will establish the inmate is deceased and the inmate's death shall be announced by the Housing Unit 9 Team Leader.

14. If all electrical activity of the heart ceases prior to administering all the chemicals, the team members shall continue to follow this protocol and administer all remaining chemicals as set forth in the Chemical Chart.

15. Throughout the entire procedure the Medical Team shall continually monitor the inmate by sight and sound to ensure that the inmate remains unconscious and that there are no complications.

- 14 -

H.    Post Execution Procedures

. . . .

2.    Special Operations Team members will clamp and cut the IV line leaving it connected to the inmate for examination by the Pinal County Medical Examiner or designee.

. . . .

6.    The Special Operations Team and the Medical Team will conduct and participate in a peer review/debriefing upon completion of the event.  All input will be considered and, if appropriate, procedures may be modified.

I.    Documentation of Chemicals

1.    Upon completion of the execution or when a stay is granted, the Special Operations Team Leader shall properly dispose of all unused chemicals according to applicable state and federal law in the presence of the Special Operations Team Recorder.

2.    The Special Operations Team Member designated as the Recorder shall observe the disposal of all chemicals that were not administered and document in the *Sequence of Chemicals* form the chemical name, syringe number, amount disposed, date disposed and the time.  The Special Operations Team Leader and the Recorder each will sign the *Sequence of Chemicals* form with their identifiers.

3.    All logs, the *Sequence of Chemicals* form, the list of identifiers and the EKG tape shall be submitted to the Department's General Counsel for review and storage.

J.    Contingency Procedure

1.    An Automated External Defibulator (AED) will be readily available on site in the event that the inmate goes into cardiac arrest at any time prior to dispensing the chemicals; trained medical staff shall make every effort to revive the inmate should this occur.

2.    Trained medical personnel and an ambulance, neither of which is involved in the execution process, shall be available in proximity to respond to the inmate should any medical emergency arise at any time before the order to proceed with the execution is issued by the Department Director.

3.    If at any point any team member determines that any part of the execution process is not going according to procedure, they shall advise the Medical Team Leader who shall immediately notify the Department Director.  The Department Director may consult with persons deemed appropriate and will determine [whether] to go forward with the procedure,

start the procedure over at a later time within the 24-hour day, or stand down.

4.     There shall be no deviation from the procedures as set forth herein without prior consent from the Department Director.

5.     The procedures outlined in this protocol for the preparation and administration of chemicals shall be reviewed and revised before and immediately after the execution and at least annually thereafter.

## C.     Three-Drug Lethal Injection

The Arizona Protocol requires sequential administration of sodium thiopental,[5] pancuronium bromide, and potassium chloride, with a heparin/saline flush immediately following each.  After administration of the sodium thiopental and the first heparin/saline flush and before administration of the pancuronium bromide, a Medical Team member will physically confirm the inmate is unconscious.

Sodium thiopental is an ultrafast-acting barbiturate that induces unconsciousness. An intravenous dose of one gram of sodium thiopental is considered to be lethal, and the five gram dose administered under the Arizona Protocol is eleven to eighteen times more than that required to produce a loss of consciousness.  A properly administered dose of five grams of sodium thiopental will produce a deep and long-lasting anesthesia in all people and eventually will cause death from respiratory arrest and cardiac depression. When successfully delivered into the circulation in sufficient quantities, sodium thiopental causes depression of the nervous system that would permit excruciatingly painful procedures to be performed without causing discomfort or distress.  Assuming the IV line is placed correctly in the vein and the sodium thiopental is delivered successfully into the bloodstream, five grams of intravenous sodium thiopental alone would cause certain unconsciousness and ultimately death within a relatively short period and with little to no risk of significant pain.

---

[5]"Sodium thiopental" is sometimes referred to as "thiopental sodium," "thiopental," or "sodium pentothal."

1    Pancuronium bromide is a paralytic neuromuscular blocking agent that prevents

2   any voluntary muscle contraction.  Pancuronium bromide mitigates involuntary muscle

3   spasms often caused by potassium chloride, which may be unpleasant for witnesses to

4   watch.  The dose administered for lethal injection in Arizona is thirteen to twenty-six

5   times more than the therapeutic dose and is likely to cause respiratory failure and

6   circulatory collapse.  Pancuronium bromide does not affect consciousness, sensation,

7   cognition, or the ability to feel pain and suffocation.  Therefore, an individual who is not

8   completely anesthetized when he receives a dose of pancuronium bromide at therapeutic

9   level or greater would experience a feeling of shortness of breath or "air hunger" and

10   would be unable to move or otherwise respond.  If administered to a conscious person,

11   pancuronium bromide would cause severe agony because the person would be unable to

12   breathe for several minutes before losing consciousness.  Further, where sodium

13   thiopental is not properly administered in a dose sufficient to cause loss of consciousness

14   for the duration of the execution procedure, the use of pancuronium bromide will do

15   nothing to alleviate the extreme pain of the intravenous injection of concentrated

16   potassium chloride.

17    Potassium chloride is a salt found in all tissues in the body and is critical for

18   maintaining normal cellular function and the excitability of muscles and nerves.  The dose

19   administered for lethal injection in Arizona is six times more than the therapeutic dose

20   and is very likely to cause skeletal muscle paralysis and cardiac arrest.  If potassium

21   chloride were administered to a conscious person, the person likely would experience a

22   severe burning sensation in the vein in which it is injected.  Furthermore, the person

23   likely would experience chest pain after the potassium chloride reached the heart, but

24   before the person lost consciousness as a result of lack of blood flow to the brain.

25   Because potassium chloride stops the heart, it produces electrical inactivity (*i.e.*, a

26   flatline) on the electrocardiogram ("EKG"), which may be observed remotely without

27   needing to physically examine the inmate.  Death from potassium chloride may be

28

pronounced more quickly than if the inmate were given sodium thiopental alone and thus died from decreased oxygen delivery to critical organs such as the heart and brain.

There is no risk that a condemned inmate to whom five grams of sodium thiopental is properly administered would experience any pain and suffering associated with the subsequent administration of lethal doses of pancuronium bromide and potassium chloride.

### D.     Improper Administration of Sodium Thiopental

Some problems that could prevent the proper administration of sodium thiopental include errors in drug preparation, labeling of syringes, selecting the correct syringe, and correctly injecting the drug into the intravenous ("IV") line; placement and insertion of the IV line; and leaking of the IV tubing.  Drug preparation and delivery problems are not uncommon in the practice of medicine.

If the IV catheter is placed into an artery instead of a vein, the sodium thiopental would be delayed in reaching the inmate's brain.  However, depositing sodium thiopental into an artery or subcutaneous tissue would be very painful and likely cause the inmate to scream, thus drawing attention to the error because administering sodium thiopental into a vein is completely painless.

### E.     Monitoring and Consciousness Assessment Required for the Three-Drug Protocol

Having a properly trained and credentialed individual examine the inmate after the administration of the sodium thiopental (but before administration of pancuronium bromide) to verify that the inmate is completely unconscious mitigates the risk that the inmate will suffer excruciating pain during his execution.  The EKG monitor and stethoscope are adequate for determining death, but not for assessing depth of consciousness.

During surgical procedures, an anesthesiologist may determine a patient's depth of consciousness by physical examination.  The examination may begin by telling the patient to open his eyes or squeeze his hand.  If the patient does not respond, the anesthesiologist

1   may look for a simple reflex response to stroking the patient's eyelashes or another tactile

2   stimulus.  Electronic monitors may be used to measure brain activity, but observing a

3   patient's spontaneous breathing is as good or better an indicator of the depth of

4   anesthesia.  If the patient changes his pattern of breathing in response to certain surgical

5   stimuli, the patient is not adequately anesthetized.  If the patient is breathing too slowly or

6   too shallowly, the patient is too deeply anesthetized.  If the surgery requires that the

7   patient be paralyzed and unable to breathe independently, then the patient's breathing

8   would not indicate depth of consciousness.  If a patient were paralyzed and conscious, his

9   heart rate and blood pressure probably would increase.

10   **F.    Use of a One-Drug Protocol**

11   Replacing the three-drug protocol with a one-drug protocol using pentobarbital or

12   sodium thiopental would eliminate the risk of severe pain from pancuronium bromide and

13   potassium chloride.  Five grams of sodium thiopental alone will cause death to almost

14   everyone within a number of minutes, but it may take thirty to forty-five minutes for the

15   death to be indicated by a flat line on an EKG.  Pentobarbital acts as rapidly as sodium

16   thiopental, and it is eliminated from the brain more slowly than sodium thiopental and

17   causes death more predictably.  When pentobarbital is given intravenously in a large dose

18   (three to four times its anesthetic dose), loss of consciousness, cessation of breathing, and

19   stoppage of the heart occur in less than two minutes.

20   Administration of a three-drug protocol requires approximately seven to eight

21   minutes for the completion of the injections.  Administering the third drug causes the

22   heart to stop and produces an EKG flatline usually more quickly than would sodium

23   thiopental alone.

24   **G.    Lethal Injection in Arizona:  1992-2000**

25   Since November 1992, the State of Arizona has provided for execution by lethal

26   injection to all newly-sentenced death row inmates.  Inmates sentenced to death before

27   November 23, 1992, may choose between execution by lethal injection and execution by

28

lethal gas.  Arizona has executed twenty-one Arizona inmates by lethal injection, twenty of those during 1993 through 2000 and one in 2007.

For each of the twenty lethal injection executions that were conducted from 1993 through 2000, the lethal injection procedures, including any written procedures for the preparation and administration of chemicals, were described in Department Order 710. From 1992 through 2000, there was no separate protocol or other document that described the preparation and administration of chemicals.  A March 13, 2006 e-mail with the subject "Lethal Injection Protocol" describes the protocol as follows:

1.    Amount of drug and type?

The following drugs are administered for execution by Lethal Injection:
1.    Sodium Pentothal (thiopental sodium) - 240 cc - 120 cc per arm
2.    Pancuronium Bromide (trade name - Pavulon) - 120 cc - 60 cc per arm
3.    Potassium Chloride - 120 cc - 60 cc per arm

2.    Procedure used to declare death?

The medical consultant monitors the display on the heart monitor that is attached to the inmate.  Once all the drugs have been injected and the heart monitor flat lines, the consultant will wait approximately 10-15 seconds and then advise an assigned staff member that death has occurred.  The staff member will record the time of death and stop the tape on the heart monitor.  The Director is then advised of the time of death.

3.    Do we monitor consciousness in any way?  How?  Who does it?

No, death generally occurs within two-three minutes.

4.    Who administers the drugs?  What type of staff?  Medical?

Drugs are administered by staff volunteers who have been trained to perform this function.  No ADC medical staff is involved in this process.  The process is monitored by a paid medical consultant who remains anonymous.  The consultant determines the need for a cut down procedure and will perform the procedure if needed.  The staff volunteers are trained to perform this procedure as well.  A constant intravenous saline drip is run to each arm.  Each drip line is connected to two 60 cc syringes filled with Sodium Pentothal, one 60 cc syringe filled with Pancuronium Bromide, and one 60 cc syringe filled with Potassium Chloride.  These syringes are connected to the intravenous lines.  Two assigned staff each administer the Sodium Pentothal, and two assigned staff administer the Pancuronium Bromide and Potassium Chloride.  This process requires each staff to

- 20 -

1   handle two syringes in the process.  The drugs are administered in
2   the following order with enough saline solution administered in
    between each drug to flush the lines and prevent crystallization or
    clogging:
3           1.      Sodium Pentothal
            2.      Pancuronium Bromide
4           3.      Potassium Chloride

5   5.      These protocols have not been documented in this level of detail.
            The process has also been maintained through practical exercises and
6           training.

7   Department Order 710 called for the placement of an IV line in both of the inmate's arms.

8   In all twenty of the executions by lethal injection from 1993 through 2000, the State of

9   Arizona established venous access through a pair of peripheral IV lines.  None of these

10  executions involved use of a femoral venous catheter.

11      **H.     Lethal Injection in Arizona:  2007**

12          After more than six years without conducting an execution, the ADC substantially

13  revised Arizona's lethal injection protocol for the May 22, 2007 execution of Robert

14  Comer.  In January 2007, when then-Director of the ADC Dora B. Schriro learned that

15  Comer was to be executed in a few months, Schriro's staff began rewriting Arizona's

16  protocol for execution by lethal injection.  Before Schriro was appointed Director of the

17  ADC, she oversaw executions as the Director of the Missouri Department of Corrections.

18  The protocol revisions made shortly before the Comer execution were based primarily on

19  Schriro's direct experience overseeing executions in Missouri and an April 2007 training

20  visit that Schriro, ADC's general counsel Susan Rogers, and others made to the execution

21  facility at the federal prison at Terre Haute, Indiana.

22          Both the Missouri and the federal execution protocols were designed by Dr. Alan

23  Doerhoff, a physician and licensed surgeon who lives in Missouri.  He has participated in

24  executions for the states of Arizona, Connecticut, and Missouri, as well as for the federal

25  government.  He also has acted as a consultant on lethal injection procedures for several

26  other states.  During Schriro's tenure in Missouri, she and Doerhoff participated together

27  in fifteen or twenty executions in Missouri.  In 2006, Doerhoff testified in a Missouri case

28  that he was dyslexic, had problems with numbers, knowingly "improvised" the doses of

1    lethal injection drugs (partly based on how conveniently or inconveniently they were

2    packaged), adhered to no set protocol, and kept no records of procedures.  The Missouri

3    District Court enjoined Doerhoff from participating "in any manner, at any level," in

4    Missouri's lethal injection process.  In January 2007, at oral argument before the Court of

5    Appeals for the Eighth Circuit, counsel for the State of Missouri informed the Court of

6    Appeals that Missouri would stop using Doerhoff and stop requiring femoral venous

7    access as the default method for administering lethal chemicals.  Schriro and Rogers

8    received an email dated May 3, 2007, stating that Missouri had informed the appeals

9    court it no longer would use Doerhoff's services for future executions and that Doerhoff

10   had come "under criticism after disclosing in testimony last year that he occasionally

11   altered the amount of anesthetic given to inmates, and following media reports that he'd

12   been sued for malpractice more than 20 times."

13          Three or four months before Comer's May 22, 2007 execution, the ADC asked

14   Doerhoff to participate in Comer's execution.  Around the same time, in January 2007,

15   Rogers began researching and drafting the document titled "Preparation and

16   Administration of Chemicals."  In the process Rogers talked to medical professionals and

17   corrections officials in Arizona and other states.  She discussed execution chemicals with

18   approximately twenty medical professionals.  Rogers continued to revise the document as

19   she got better information or found something that needed to be changed and said that

20   "it's never going to be a permanent document."  She also said, "It's a continual process.

21   And I delete and add stuff."  She drafted the document that was used for Comer's

22   execution, but changed "a significant part" of it after his execution without saving prior

23   versions.  One of the changes made before Comer's execution replaced the use of two

24   peripheral IV lines (primary and backup) to administer chemicals with the use of a

25   central line catheter into the inmate's femoral vein to administer chemicals, as was used

26   in Missouri under Schriro's oversight.  Changes made to Arizona's lethal injection

27   protocol after Comer's execution included "having the doctor go into the room and

28

physically manipulate the inmate" and adding "a full backup set of chemicals for both the dummy bucket and for the individual."

Contemporaneous handwritten time entries in the "Special Operations Checklist" from the autopsy file of Comer's execution indicate that the lethal chemicals were administered with less time between injections than necessary. The preprinted portion of the Checklist states that at 10:01:

> First injection commences. Four syringes filled with 1.25 grams each of Sodium Pentothal and sterile water. Process takes about 2 minutes, 45 seconds. Saline flush follows. Housing Unit 9 Team Leader waits until inmate is asleep before he informs the Chemical Room to begin Phase II.

Although the process is supposed to begin at 10:01 and take almost three minutes, and the second injection is not supposed to begin until it is determined the inmate is "asleep," the preprinted Checklist states, also at 10:01, "Second injection commences." The second injection is the pancuronium bromide that prevents any voluntary muscle contraction, making it impossible for the inmate to move or indicate consciousness. The preprinted Checklist states at 10:02, "Second injection completed. Saline flush follows." Then, at 10:04, the preprinted Checklist states that the third injection (potassium chloride) commences and is completed, and the Special Operations Team Leader signals to the Housing Unit 9 Team Leader that all lethal drugs have been administered. The handwritten notes indicate that the first injection commenced at 10:05, the second injection commenced at 10:05, the second injection was completed at 10:07, the third injection commenced at 10:07, and the third injection was completed at 10:08.

## I.     Lethal Injection in Arizona:  2009

On April 9, 2009, Defendants agreed to the following changes to the prior lethal injection protocol:

- Default central intravenous line in the femoral vein—Defendants have agreed that the lethal chemicals will, by default, be administered through a peripheral intravenous line. Primary and back-up peripheral lines will be placed only by medically licensed individuals with at least one year current and regular practice placing such lines, along with back-up procedures as detailed in Section F of Exhibit A.

1

2

3

- • <u>License and criminal background checks</u>—Defendants have agreed to require license and background checks of Medical Team Members prior to allowing them to participate in the lethal injection process, annually after contracting with them, and upon an issuance of a warrant of execution.

4

- • <u>Concentration of thiopental</u>—Defendants have agreed to use the clinical concentration of thiopental of 2.5%.

5

6

- • <u>False line</u>—Defendants have agreed to eliminate the use of a "false" line.

7

8

9

- • <u>Dr. Doerhoff and Medical Team Member #3</u>—Defendants have agreed that Dr. Alan Doerhoff and Medical Team Member #3 will not participate in executions in Arizona in the future in any way, including during an execution, training for an execution, or on a consulting basis.

10   (Doc. #131 at 3.)  Defendants also agreed to require that all Medical Team members

11   "have at least one year of current and relevant professional experience in their assigned

12   duties on the Medical Team" and participate in a minimum of ten execution rehearsals

13   with the Special Operations Team.  (*Id.* at 13.)  Further, two Medical Team members,

14   identified as the IV team, will be assigned the responsibility of inserting the IV catheters.

15   (*Id.*)  Although the parties submitted to the Court agreed upon revisions to portions of the

16   document "Preparation and Administration of Chemicals," they did not submit a

17   document that states the complete and current Arizona Protocol.

18         Currently, there is no formal process for revising the Arizona lethal injection

19   protocol or the document "Preparation and Administration of Chemicals" or for

20   communicating revisions to people who are affected by protocol changes.  The only

21   limitation on changing the protocol is that deviations and substantive revisions must be

22   approved by the Department Director.  The ADC does not keep a record of revisions or of

23   the process by which decisions to revise the protocol are made.  Documents titled

24   "Preparation and Administration of Chemicals" with different dates but the same content

25   were produced in this litigation and represented as the current lethal injection protocol

26   even though Rogers stated the documents needed corrections.

27         In addition, "the composition of all teams involved in the execution process is

28   fluid—not static."   (Doc. #126 at 4.)  Although the Medical Team had three members,

1   Defendants agreed not to use one of the "current" members,[6] and another was deployed to

2   Iraq and has been removed from the team.  Neither Department Order 710 nor the

3   Arizona Protocol defines a minimum number of members for the Medical Team other

4   than two Medical Team members will be assigned the responsibility of inserting the IV

5   catheters.  Defendants have stated, however, "The Medical Team will consist of more

6   than one individual," and "the Department will ensure a qualified team is in place for any

7   scheduled execution."  (Doc. ##126 at 4, 131 at 8.)

8          Although the Arizona Protocol states, "The Special Operations Team consists of

9   seven medically trained team members and a Team Leader," the ADC does not require

10  Special Operations Team members to have prior medical training.  According to Rogers,

11  although a medical background is preferred, team members will "get training on the

12  protocol as they go through their training process," which is not medical training, but all

13  the training they need to "push a syringe."  Although the Arizona Protocol requires that

14  each proposed Special Operations team member "undergo a screening panel and an

15  individual interview prior to their final selection," the current Special Operations Team

16  Leader never had an individual interview or screening panel interview.

17  **IV.   Analysis**

18         Defendants seek summary judgment that the Arizona Protocol, as written, does not

19  violate the Eighth Amendment of the United States Constitution.  Plaintiffs contend that

20  the Court also must determine whether the Arizona Protocol, as implemented, violates the

21  Eighth Amendment although the Arizona Protocol, as currently revised, never has been

22  implemented.

23         **A.      Legal Standard Under the Eighth Amendment**

24  _____

25         [6]Medical Team Member #3 did not attend medical school, was once a nurse, had his
    nursing license suspended, attended emergency medical technician training, and is not a
26  licensed emergency medical technician.  He now owns an appliance business in a state
    outside of Arizona.  Following military service in Iraq, he has been treated by the Veterans
27  Administration for post-traumatic stress disorder.  He has been arrested multiple times,
    including three times in ten days in Arizona for a DUI in 2007.
28

1    The Eighth Amendment, applicable to the States through the Fourteenth

2    Amendment, "prohibits punishments that involve the unnecessary and wanton inflictions

3    of pain, or that are inconsistent with evolving standards of decency that mark the progress

4    of a maturing society." *Cooper v. Rimmer*, 379 F.3d 1029, 1032 (9th Cir. 2004).  It also

5    prohibits executions "that involve the unnecessary and wanton infliction of pain, involve

6    torture or a lingering death, or do not accord with the dignity of man." *Beardslee v.*

7    *Woodford*, 395 F.3d 1064, 1070 (9th Cir. 2005) (en banc) (internal quotation marks and

8    citations omitted).  In addition, the Eighth Amendment protects inmates against the risk of

9    future harm—"sufficiently imminent dangers" and risk of harm that is "sure or very likely

10   to cause serious illness and needless suffering." *Helling v. McKinney*, 509 U.S. 25, 33, 34

11   (1993).  To violate the Eighth Amendment, there must be a "substantial risk of serious

12   harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).  The Ninth Circuit has upheld the

13   constitutionality of lethal injection as a method of execution. *Cooper*, 379 F.3d at 1033.

14   In 2008, the United States Supreme Court held Kentucky's method of execution by

15   lethal injection was consistent with the Eighth Amendment. *Baze v. Rees*, __ U.S. __,

16   128 S. Ct. 1520 (2008).  The decision encompassed seven separate opinions:  the plurality

17   opinion announcing the judgment of the Court authored by Chief Justice Roberts and

18   joined by Justices Alito and Kennedy; separate concurring opinions by Justices Alito,

19   Stevens, and Breyer; concurring opinions by Justices Scalia and Thomas and joined by

20   each other; and a dissenting opinion by Justice Ginsburg, joined by Justice Souter.

21   Because a plurality opinion does not represent the views of a majority of the Court,

22   its reasoning is not controlling. *United States v. Brobst*, 558 F.3d 982, 991 (9th Cir.

23   2009); *Jacobsen v. U.S. Postal Serv.*, 993 F.2d 649, 655 (9th Cir. 1992).  The Ninth

24   Circuit, however, has tried to find common ground between a plurality and the

25   concurrences. *Jacobsen*, 993 F.2d at 655.  Moreover, the United States Supreme Court

26   has stated, "When a fragmented Court decides a case and no single rationale explaining

27   the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as

28   that position taken by those Members who concurred in the judgments on the narrowest

1    grounds. . . .'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v.*

2    *Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, J.J.)).

3         Here, however, "there are no reliable means of determining the 'narrowest

4    grounds' presented in *Baze* because three blocks of Justices provided three separate

5    standards for determining the constitutionality of a mode of execution":

6              Specifically, the *Baze* plurality adopted a version of the substantial-risk
               standard, while Justice Breyer, concurring in the judgment, and Justices
7              Ginsburg and Souter, dissenting, adopted a version of the unnecessary-risk
               standard.  In contrast, Justices Thomas and Scalia renounced any risk-based
8              standard in favor of a rule of law that would uphold any method of
               execution which does not involve the *purposeful* infliction of "pain and
9              suffering beyond that necessary to cause death."  Justice Stevens did not
               provide a separate standard but, instead, expressed general disagreement
10             with (1) the death penalty based upon his long experience with these cases
               and the purported erosion of the penalty's theoretical underpinnings
11             (deterrence, incapacitation, and retribution), and (2) the allegedly
               unnecessary use of the paralytic drug pancuronium bromide.
12
     *Ventura v. Florida*, 2 So.3d 194, 199-200 (Fla. 2009) (citations and footnotes omitted).[7]
13
     *See also Cooey v. Strickland*, __ F. Supp. 2d __, 2009 WL 1067049 at *67 (S.D. Ohio
14
     April 21, 2009) ("Absent a controlling rationale set forth by a majority of the high court,
15
     what can be gleaned from the diverse array of opinions in *Baze* is debatable."); Mark B.
16
     Samburg, *Cruel and Unusual?  The Bifurcation of Eighth Amendment Inquiries After*
17
     Baze v. Rees, 44 Harv. C.R.-CL. L. Rev. 213, 218 (2009) ("The Supreme Court's actual
18
     holding was incredibly narrow—the only proposition with which five Justices clearly
19
     agreed was the result, namely that the Kentucky protocol did not violate the Eighth
20
     Amendment.").
21
          In response to Justice Stevens' suggestion that the plurality opinion leaves the
22
     disposition of other cases uncertain, Chief Justice Roberts wrote:
23

24

25 _____

26        [7]Under the plurality opinion, a state's refusal to adopt an alternative method, without
     a legitimate penological justification for adhering to its current method of execution, can be
27   viewed as "cruel and unusual" under the Eighth Amendment if the alternative is feasible,
     readily implemented, and in fact significantly reduces a substantial risk of severe pain. *Baze*,
28   128 S. Ct. at 1532.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> ...the standard we set forth here resolves more challenges than [Justice Stevens] acknowledges.  A stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain.  He must show that the risk is substantial when compared to the known and available alternatives.  A State with a lethal injection protocol similar to the protocol we uphold today would not create a risk that meets this standard.

*Baze*, 128 S. Ct. at 1537.  Therefore, the Arizona Protocol does not violate the Eighth Amendment if it is similar to the Kentucky lethal injection protocol upheld in *Baze* ("the Kentucky Protocol") or provides greater protection against the risk of severe pain than did the Kentucky Protocol.  To the extent issues raised by Plaintiffs were not addressed in *Baze*, the Arizona Protocol violates the Eighth Amendment if it subjects inmates to a substantial risk of serious harm or a risk of harm that is "sure or very likely to cause . . . needless suffering."  *See Farmer*, 511 U.S. at 842; *Helling*, 509 U.S. at 33.

**B.      The Use of Pancuronium Bromide and Potassium Chloride**

Here, as in *Baze* and *Beardslee*, Plaintiffs concede that if the first drug, sodium pentothal, is properly administered, it will render the inmate unconscious and unable to experience pain from the administration of the second and third drugs in the Arizona Protocol.  Defendants, as did defendants in *Baze* and *Beardslee*, concede that if the sodium pentothal is not properly administered and the inmate is not unconscious, the second and third drugs will cause severe pain.  In *Beardslee*, the Ninth Circuit affirmed denial of a preliminary injunction based on an  Eighth Amendment challenge to California's lethal injection protocol because:

> Beardslee has not shown a sufficient likelihood that the administration will be improper in his case, or that there are specific risks unique to him that require modification of the protocol.  His objections to the use of pancuronium bromide become irrelevant upon the proper administration of sodium pentothal.

*Beardslee*, 395 F.3d at 1076.  Under *Baze* and *Beardslee*, to obtain summary judgment upholding the three-drug protocol as constitutionally permissible, Defendants must show on undisputed facts that the Arizona Protocol is similar to the Kentucky Protocol or has greater safeguards against the risk that the sodium thiopental will be improperly

- 28 -

1  administered and the pancuronium bromide and potassium chloride will be administered

2  to a conscious inmate.

3      The Kentucky Protocol requires injection of 3 grams of sodium thiopental, 50

4  milligrams of pancuronium bromide, and 240 milliequivalents of potassium chloride with

5  saline flushes between the injections. *Baze*, 128 S. Ct. at 1528.  The Arizona Protocol

6  requires 5 grams of sodium thiopental, 50 milligrams of pancuronium bromide, and 240

7  milliequivalents of potassium chloride with heparin/saline flushes after each of the

8  injections.  By administering more sodium thiopental than the Kentucky Protocol, the

9  Arizona Protocol provides greater assurance that, if the sodium thiopental is properly

10  administered, the inmate will be deeply unconscious and likely to die before the

11  pancuronium bromide and potassium chloride are administered.

12      The Kentucky Protocol requires the warden and deputy warden to remain in the

13  execution chamber with the prisoner and determine by visual inspection whether the

14  inmate is conscious.  *Id.*  If he is not unconscious within sixty seconds following the

15  delivery of the sodium thiopental to the primary IV site, a new three-gram dose of

16  thiopental must be administered to the secondary site before injecting the pancuronium

17  and potassium chloride.  *Id.*  In addition, the warden and deputy warden also are required

18  to watch for any problems with the IV catheters and tubing.  *Id.*

19      The Arizona Protocol requires the warden to "physically remain in the room with

20  the inmate throughout the administration of the chemicals in a position sufficient to

21  clearly observe the inmate and the primary and backup IV sites for any potential

22  problems."  If the warden observes any "issue," the warden must notify the Medical Team

23  Leader and Department Director.  The Director then will stop the proceedings, consult

24  with the Medical Team, and decide how to proceed.  Also, the Medical Team is required

25  to "continually monitor the inmate's level of consciousness and electrocardiograph

26  readings, maintaining constant observation of the inmate utilizing direct observation,

27  audio equipment, camera and monitor as well as any other medically approved method(s)

28  deemed necessary by the Medical Team."

1    Under the Arizona Protocol, after the sodium thiopental and first heparin/saline

2  flush are administered, "the Medical Team shall confirm the inmate is unconscious by

3  sight and sound, utilizing the audio equipment, camera and monitor," and a Medical

4  Team member will "physically confirm the inmate is unconscious, and that the catheter

5  and lines are affixed and functioning properly, using methods deemed medically

6  necessary."  No further chemicals may be administered until the Medical Team has

7  confirmed the inmate is unconscious.  If the inmate still is conscious after the sodium

8  thiopental is administered, the Medical Team must assess the situation to determine why

9  the inmate is conscious, and the Department Director will determine how to proceed.

10  Unlike the Kentucky Protocol, the Arizona Protocol does not require the automatic

11  administration of a second dose of sodium thiopental without investigation, but instead it

12  permits the Department Director to instruct the Special Operations Team to administer a

13  second dose of the sodium thiopental if the Director determines it is appropriate.  The

14  Arizona Protocol does not permit administration of the pancuronium bromide until the

15  Medical Team "has confirmed the inmate is and remains unconscious and three minutes

16  have elapsed since commencing the administration" of the sodium thiopental.

17    Further, the Arizona Protocol requires that two IV catheters be inserted in separate

18  locations, one of which is reserved for use if the primary line fails.  If the use of the

19  backup IV catheter is determined to be necessary, the Arizona Protocol requires that a

20  complete set of backup chemicals be administered through the backup IV line.

21    Therefore, the Arizona Protocol, as currently revised, provides more safeguards

22  than does the Kentucky Protocol against the risk that the sodium thiopental will be

23  improperly administered and the pancuronium bromide and potassium chloride will be

24  administered to a conscious inmate.  The Arizona Protocol, as currently revised, does not

25  subject an inmate to a "substantial risk of serious harm," "sufficiently imminent dangers,"

26  or a risk of harm that is "sure or very likely to cause . . . needless suffering."  *See Farmer*,

27  511 U.S. at 842; *Helling*, 509 U.S. at 33.   Although Plaintiffs contend that replacing the

28  three-drug protocol with a one-drug protocol, *i.e.*, eliminating the use of pancuronium

1    bromide and potassium chloride, would avoid any possibility of severe pain from the

2    pancuronium bromide and potassium chloride, the Eighth Amendment does not require

3    Defendants to avoid any possibility of severe pain, only to protect against a substantial

4    risk of serious harm.

5    **C.   Requiring that a Medical Team Member Have Experience
           Administering Anesthesia If Pancuronium Bromide and Potassium
6          Chloride Are Used**

7    Plaintiffs contend that if the administration of pancuronium bromide and

8    potassium chloride is permitted, the Medical Team member responsible for assessing the

9    inmate's consciousness must have current and regular experience administering

10   anesthesia and measuring a patient's anesthetic depth.  Undisputed expert testimony

11   establishes that, in surgery, an anesthesiologist would assess consciousness by telling the

12   patient to respond and, upon receiving no response, would look for a simple reflex

13   response to a tactile stimulus.  If the patient were breathing spontaneously, an

14   anesthesiologist also would monitor the patient's breathing and would interpret a change

15   of breathing in response to surgical stimuli as an indication the patient was not adequately

16   anesthetized.

17   Unlike a surgical context where an anesthesiologist must avoid too deeply

18   anesthetizing the patient, the Arizona Protocol requires administration of an amount of

19   sodium thiopental that will produce a deep and long-lasting anesthesia in all people if

20   properly administered.  The purpose of assessing consciousness, then, is to determine if

21   the flow of sodium thiopental has been blocked or otherwise not delivered in the full

22   amount to the inmate's vein.

23   The Arizona Protocol requires that a microphone "be affixed to the inmate's shirt

24   to enable the Medical Team and Special Operations Team Leader to verbally

25   communicate directly with the inmate and hear any utterances or noises made by the

26   inmate throughout the procedure."  It requires that the inmate "be positioned to enable the

27   Medical Team and Special Operations Team Leader to directly observe the inmate and to

28   monitor the inmate's face with the aid of a high resolution color NTSC CCD camera with

1   10x Optical zoom lens with pan tilt capability and a 19-inch resolution color monitor."  It

2   requires the Medical Team to "continually monitor the inmate's level of consciousness

3   and electrocardiograph readings, maintaining constant observation of the inmate utilizing

4   direct observation, audio equipment, camera and monitor as well as any other medically

5   approved method(s) deemed necessary by the Medical Team."  It requires the warden to

6   "physically remain in the room with the inmate throughout the administration of the

7   chemicals in a position sufficient to clearly observe the inmate and the primary and

8   backup IV sites for any potential problems."  Further, after administration of the sodium

9   thiopental and heparin/saline flush, the Medical Team must "confirm the inmate is

10  unconscious by sight and sound, utilizing the audio equipment, camera and monitor," and

11  a Medical Team member must "enter into the room where the inmate is located to

12  physically confirm the inmate is unconscious, and that the catheter and lines are affixed

13  and functioning properly, using methods deemed medically necessary."  Although the

14  Arizona Protocol does not define "methods deemed medically necessary," it is likely that

15  Medical Team members, who must be medically trained, would be able to assess

16  consciousness by telling the patient to respond and, upon receiving no response, be able

17  to look for a simple reflex response to a tactile stimulus.

18        In *Baze*, the United States Supreme Court upheld the Kentucky Protocol, but did

19  not address whether the person responsible for assessing the inmate's consciousness must

20  have experience administering anesthesia.  128 S. Ct. 1520.  Five days after deciding

21  *Baze*, the Court declined to review *Taylor v. Crawford*, 487 F.3d 1072 (8th Cir. 2007),

22  *cert. denied*, 128 S. Ct. 2047 (2008), in which the Eighth Circuit held that Missouri's

23  written lethal injection protocol does not violate the Eighth Amendment even though the

24  protocol did not require that the person assessing the anesthetic depth of the inmate be

25  trained in anesthesia:

26        The written protocol requires a 5-gram dose of thiopental to be delivered
          through a properly placed and working IV, combined with a three-minute
27        wait and a physical confirmation of unconsciousness before the last two
          chemicals are administered.  The experts agree that this dose, successfully

28

delivered, will cause burst suppression[8] in less than three minutes and last at least 45 minutes, which eliminates any need for further monitoring. Given the dose of thiopental provided in the protocol, the precautions taken to ensure it is successfully delivered, the three-minute wait built into the protocol before administration of the second and third chemicals, the ready availability of syringes containing an additional five grams of thiopental, and the physical examination of the prisoner and the IV site prior to administering the second and third chemicals, there simply is no realistic need for further monitoring of anesthetic depth by a physician or sophisticated equipment to prevent a constitutionally significant risk of pain.

*Id.* at 1084.

Here, as in *Taylor*, the Arizona Protocol's failure to require that the Medical Team member responsible for assessing the inmate's consciousness have current and regular experience administering anesthesia and measuring a patient's anesthetic depth does not subject the inmate to a "substantial risk of serious harm," "sufficiently imminent dangers," or a risk of harm that is "sure or very likely to cause . . . needless suffering," and does not violate the Eighth Amendment. *See Farmer*, 511 U.S. at 842; *Helling*, 509 U.S. at 33.

### D. Psychological and Medical Screening of Potential Medical Team Members and the ADC's Retention of Medical Team Member Screening Documentation

The Arizona Protocol requires the Medical Team to include at least two members, and each member must be a physician, physician assistant, nurse, emergency medical technician, paramedic, military corpsman, phlebotomist, or other medically trained personnel. Each member must have at least one year of current and relevant professional experience in his assigned duties on the Medical Team. Selection of Medical Team members must include a review of the proposed team member's professional qualifications, training, experience, professional licenses and certifications, criminal history, and personal interview. Licensing and criminal history reviews must be conducted before contracting, annually, and upon the issuance of a warrant of execution.

---

[8]"Burst suppression" is a state of the brain as measured by an electroencephalograph ("EEG") in which the EEG demonstrates the periodic absence of electrical activity. It is a state of anesthesia deeper than that required for surgery.

1    In addition, Plaintiffs contend that Defendants also should be required to screen

2    potential Medical Team members for psychological and medical problems, including drug

3    addictions, that could impair their ability to competently perform the functions of a

4    Medical Team member.  Prior selection of Medical Team members demonstrates the need

5    for the selection requirements now included in the Arizona Protocol, but it does not

6    establish a substantial risk of serious harm from failure to screen for psychological and

7    medical problems if Medical Team members are required to have at least one year of

8    current and relevant professional experience in their assigned duties on the Medical Team

9    and licensing and criminal history reviews are conducted before contracting, annually,

10   and upon the issuance of a warrant of execution.

11   The Arizona Protocol requires the ADC to maintain any documentation

12   establishing qualifications, including training, of the Medical Team members.  It does not

13   specifically require the ADC to retain all documentation concerning the screening,

14   contracting, and retention process for each Medical Team member although doing so

15   would assist the ADC in establishing its compliance with the Arizona Protocol if it needs

16   to do so in response to future litigation.  However, failure to retain all documentation

17   concerning the screening, contracting, and retention process for each Medical Team

18   member, alone, does not subject inmates to a substantial risk of serious harm or risk of

19   harm that is very likely to cause needless suffering.

**E.    Selection of Medical Team Members and Disclosing Current and Future Medical Team Member Identities**

20

21   Plaintiffs contend that Defendants' past record permits the Court to predict

22   Defendants will not comply with the Arizona Protocol in the future selection of Medical

23   Team members because some previous Medical Team members had serious deficiencies

24   even though Defendants said they had conducted background and license checks for

25   them.  However, until shortly before the Comer execution in 2007, Arizona did not have

26   any written lethal injection protocol, much less one establishing procedures for selecting

27   Medical Team members.  The 2007 protocol did not require Defendants to conduct

28

1  background and license checks for prospective Medical Team members; it required only

2  that members be "medically trained personnel including physician(s), nurse(s) and/or

3  emergency medical technician(s)."  Now, the Arizona Protocol requires that selection of

4  team members "include a review of professional qualifications, training, experience,

5  professional license(s) and certification(s), criminal history, and personal interview," and

6  that all team members "have at least one year of current and relevant professional

7  experience in their assigned duties on the Medical Team."  The Arizona Protocol further

8  requires the licensing and criminal history reviews be conducted prior to contracting,

9  annually, and upon issuance of a warrant of execution.  The ADC's selection of Doerhoff

10  and Medical Team Member #3 when licensing and background checks were not required

11  does not demonstrate that the ADC is likely to select future Medical Team members

12  without licensing and background checks when licensing and background checks are

13  required by a written protocol held constitutional.

14      Plaintiffs also contend that Defendants cannot show compliance with the Eighth

15  Amendment without having a qualified Medical Team in place.  They "believe it is

16  unclear who comprises the current Medical Team and whether there will be a qualified

17  Medical Team in place for any future executions."  Defendants respond that "the selection

18  of Medical Team members is a fluid process and the Department will ensure a qualified

19  team is in place for any scheduled execution."  Although Plaintiffs may be skeptical about

20  Defendants' assurances, the record does not establish that Defendants likely will fail to

21  comply with the Arizona Protocol in future Medical Team selections.  As long as

22  Defendants comply with the Arizona Protocol in selecting and training a Medical

23  Team—or refrain from conducting any executions until they do comply with the Arizona

24  Protocol—the Eighth Amendment does not require Defendants to select and disclose the

25  identities of the Medical Team members to Plaintiffs.

26

27

28

1

2

### F.   Amendment Procedures and Notice of Amendments to Special Operations Team and Medical Team Members[9]

3

4

The Arizona Protocol, as defined in this Order, does not violate the Eighth

Amendment if it is implemented as written.  Although the Arizona Protocol does not

5

include amendment procedures,[10] it suggests that the quantities of chemicals prepared and

6

administered may be changed with prior approval of the Department Director and that

7

there may be deviations from the Chemical Chart that must be recorded.  The Arizona

8

Protocol also requires that the procedures for preparation and administration of chemicals

9

be "reviewed and revised before and immediately after the execution and at least annually

10

thereafter."  The record shows Defendants previously amended Arizona's lethal injection

11

protocol without documenting when, why, and by whom amendments have been made

12

and approved.   Changing the amounts and/or concentration of chemicals, the number of

13

syringes, the order in which the chemicals are administered, the length of time between

14

injections, procedures for monitoring and assessment of consciousness, selection and

15

qualifications of team members, and other provisions of the Arizona Protocol may affect

16

the constitutionality of Arizona's lethal injection protocol.  The Eighth Amendment does

17

not require Defendants to adopt amendment procedures, but summary judgment in

18

Defendants' favor on the constitutionality of the Arizona Protocol would not preclude

19

future challenges to amended versions of the Arizona Protocol.

20

Although the Arizona Protocol does not specify how or when notice of

21

amendments are to be given to Special Operations Team and Medical Team members,

22

23

[9]There appears to be no dispute that each Plaintiff is entitled to notice of any

24

amendment to the Arizona Protocol if the amendment will be in effect for the Plaintiff's execution.  *See Oken v. Sizer*, 321 F. Supp. 2d 658, 664 (D. Md. 2004) ("Fundamental

25

fairness, if not due process, requires that the execution protocol that will regulate an inmate's death be forwarded to him in prompt and timely fashion.").

26

27

[10]State law does not set any requirements for adopting or amending the Arizona

28

Protocol. Rules made by the Department of Corrections are exempted from the general rule-making provisions of the Administrative Procedures Act.  A.R.S. § 41-1005(A)(23).

1    Defendants must do so to satisfy other requirements.  The Arizona Protocol twice states:

2    "The Division Director for Offender Operations and the Medical Team Leader shall

3    ensure that all [Medical Team] members thoroughly understand all provisions contained

4    herein as written and by practice."  Further, "IV team members and non-medically

5    licensed team members shall participate in a minimum of ten (10) execution rehearsals

6    per year with the Special Operations Team" and "All team members shall have

7    participated in at least two (2) execution rehearsals prior to participating in an actual

8    execution."  "The Special Operations Team shall undergo annual training," and "[i]n the

9    event that a Warrant of Execution is issued, the Special Operations Team will also train

10   weekly up to the date of the execution."  "The training shall ensure all team members

11   thoroughly understand the procedures as written and by practice."  If the Arizona Protocol

12   is amended, the amendments necessarily must be communicated to those whose

13   responsibilities are affected to ensure all team members understand and implement the

14   amended procedures.

15        The Arizona Protocol also provides for the exercise of administrative and/or

16   medical judgment, which should be distinguished from amending the Protocol.  For

17   example, the IV team members are required to insert a primary IV catheter and a backup

18   IV catheter in two separate peripheral veins "unless in the opinion of the Medical Team

19   Leader it is not possible to reliably place two peripheral lines."  If in the opinion of the

20   Medical Team Leader it is not possible to reliably place a peripheral line in the inmate, a

21   Medical Team member may place a percutaneous central line in the inmate's femoral vein

22   as directed by the Arizona Protocol.  Further, if the venous access fails or the inmate

23   remains conscious after administration of the sodium thiopental, the Department Director

24   must be informed and decide what corrective or alternative action will be taken in

25   compliance with the Arizona Protocol.  Such actions, anticipated by the Arizona Protocol,

26   would not be amendments to the Arizona Protocol.

27        Now that Defendants have voluntarily established a written lethal injection

28   protocol that has been found to comply with the Eighth Amendment, the Court cannot

1   presume that Defendants will amend it in a manner that will impose on inmates a

2   substantial risk of serious harm.  *See Jackson v. Danberg*, 601 F. Supp. 2d 589, 598-99

3   (D. Del. 2009) (although "executions by lethal injection had been carried out in Delaware

4   with a casualness in procedure that cannot be tolerated in the future," plaintiffs did not

5   show there was "a substantial risk of inadequate dose of sodium thiopental under the new

6   protocol" or "that any maladministration of the new protocol is 'very likely' to pose an

7   'objectively intolerable risk of harm'").  On the record here, there is no genuine issue of

8   material fact regarding whether the Arizona Protocol's lack of amendment procedures

9   causes substantial risk of serious harm to inmates or risk of harm that is very likely to

10  cause needless suffering.

11  **V.      Conclusion**

12          Based on undisputed facts, the Arizona Protocol is substantially similar to the

13  lethal injection protocol approved in *Baze*.  As written, the Arizona Protocol does not

14  subject inmates to a substantial risk of serious harm and does not violate the Eighth

15  Amendment.  Further, the record does not demonstrate a substantial risk that Defendants

16  will violate the Arizona Protocol in the future in a manner that is sure or very likely to

17  cause needless suffering.

18          IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment

19  (doc. #94) is granted.

20          IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendants

21  and against Plaintiffs.  The Clerk shall terminate this case.

22          DATED this 1st day of July, 2009.

23

24          _____
                          Neil V. Wake
25                  United States District Judge

26

27

28